FILED

2018 APR 27 PM 2:55

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

PAID

APR   7 202

Clerk, US District Court
COURT 4612

**THE LAW OFFICE OF MYCHAL WILSON**
Mychal Wilson SBN 236189
401 Wilshire Blvd., 12th Floor
Santa Monica, CA 90401
Telephone: (424) 252-4232
Facsimile: (310) 424-7116
E-mail: mw@mychalwilsonesq.com

**CUTTER LAW PC**
C. Brooks Cutter, SBN 121407
John R. Parker, Jr., SBN 257761
401 Watt Avenue
Sacramento, CA 95864
Telephone: (916) 290-9400
Facsimile: (916) 588-9330
E-mails: bcutter@kcrlegal.com / jparker@kcrlegal.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
and

THE STATES OF ARKANSAS,
CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE,
FLORIDA, GEORGIA, HAWAII,
ILLINOIS, INDIANA, IOWA,
LOUISIANA, MARYLAND,
MASSACHUSETTS, MICHIGAN,
MINNESOTA, MISSOURI,
MONTANA, NEVADA, NEW
JERSEY, NEW MEXICO, NEW
YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND,
TENNESSEE, VERMONT, VIRGINIA,
WASHINGTON, AND THE DISTRICT
OF COLUMBIA

CV18-03591-DSF(JCx)

**COMPLAINT FOR DAMAGES
AND DEMAND FOR JURY TRIAL**

-1-

Complaint for Damages and Demand for
Jury Trial

1   ex rel.
    ALEXANDER VOLKOFF, LLC,

2

3                     Relator,
   vs.

4

5   JANSSEN PHARMACEUTICA N.V.,
   JANSSEN PHARMACEUTICALS,

6   INC., and JANSSEN RESEARCH &
   DEVELOPMENT, LLC, JOHNSON &

7   JOHNSON, and ORTHO-MCNEIL

8

9   Defendants.

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27

28

-2-

Complaint for Damages and Demand for
Jury Trial

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................9

PARTIES....................................................................................................19

JURISDICTION AND VENUE .................................................................22

FACTS .......................................................................................................23

  A. Defendants Illegally Promoted Drugs for Dangerous Off-Label Uses. ..........23

    i. Defendants' off-label promotion of opioid drugs...........................................27

    ii. Defendants' off-label marketing of Olysio .................................................33

    iii. Defendants' off-label marketing of Xarelto ..............................................38

    iv. Defendants' off-label promotion of Levaquin............................................39

    v. Defendants' off-label promotion of Invokana ...............................................42

    vi. Defendants' off-label promotion of Simponi ..............................................43

    vii. Defendants' scheme to get off-label drug uses covered by insurance. .........43

    viii. Defendants sponsored seminars, symposia, and other continuing medical education programs that promoted the off-label use of their drugs....................46

    ix. Defendants provided financing and other support for questionable research to support and promote the use of their drugs in off-label patient populations..47

  B.  Defendants Illegally Promoted Use of Their Drugs by Providing Kickbacks to Physicians and Researchers. ..........................................................................48

    i. Defendants Paid Physicians Honoraria, and Lavish Meals to Attend or Speak at Events Promoting the Use of Opioid Drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs. ..........................................................................................57

    ii. Defendants Concealed Some Illegal and Fraudulent Payments to Physicians by Funneling Them through Third Party Consultant Companies. ....................63

-3-

iii. Defendants Knew Their Payments to Physicians Were Illegal Because They Were Intended for the Purposeful Inducement of Business. ...............................63

iv. Defendants' Payment of Illegal Kickbacks to Physicians Actually Affected the Use of Opioid Drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs among Doctors ...............................................................................................64

C.   Defendants Illegally Promoted Use of Opioid Drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Drugs by Illegally Promoting a Spread between Published Pricing and the Prices Offered to Customers. .......................................................................67

DEFENDANT'S ACTS OF RETALIATION .........................................................76

DEFENDANTS' SCHEMES RESULTED IN FALSE CLAIMS TO MEDICAID AND MEDICARE ...................................................................................................86

CONCLUSION ........................................................................................................88

Count I; FALSE CLAIMS ACT ..............................................................................88

   CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS......88

Count II; FALSE CLAIMS ACT .............................................................................89

   CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT .............................................................................................89

Count III; FALSE CLAIMS ACT ...........................................................................90

   CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT ................................................................................................................................90

Count IV; FALSE CLAIMS ACT ...........................................................................90

-4-

CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS;
ILLEGAL RENUMERATION ........................................................................90
Count V; FALSE CLAIMS ACT ........................................................................92
CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED
TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY
THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND
COMPENSATION ARRANGEMENTS ...........................................................92
Count VI; FALSE CLAIMS ACT .......................................................................93
CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A
FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID ...........................93
Count VII ...........................................................................................................94
(Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.) ......94
Count VIII ..........................................................................................................97
(California False Claims Act, Cal. Gov't Code § 12650 et seq.) ......................97
Count IX .............................................................................................................99
(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 et seq.) 99
Count X ............................................................................................................101
(Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 et seq.)
..........................................................................................................................101
Count XI ...........................................................................................................104
(Connecticut False Claims Act for Medical Assistance Programs, Connecticut
General Statutes § 17b-301b. et seq.) ..............................................................104
Count XII ..........................................................................................................107
(Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.) ...................107
Count XIII .........................................................................................................110
(District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et
seq.) ..................................................................................................................110

Count XIV...........................................................................................112

    (Florida False Claims Act, Fla. Stat. §§ 68.081 et seq.)......................112

Count XV ...........................................................................................115

    (Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq.)

    ............................................................................................................115

Count XVI..........................................................................................117

    (Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.)...........117

Count XVII.........................................................................................120

    (Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 et seq.)...120

Count XVIII........................................................................................122

    (Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 et seq.).......122

Count XIX..........................................................................................124

    (Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 et seq.)

    ............................................................................................................124

Count XX ...........................................................................................127

    (Iowa False Claims Act, Iowa Code § 685.1 et seq.) ........................127

Count XXI..........................................................................................130

    (Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann §

    437.1 et seq.)....................................................................................130

Count XXII .........................................................................................132

    (Maryland Medicaid False Claims Against State Health Plans and State Health

    Programs Act, Annotated Code of Maryland § 2-601 et seq.) ..........132

Count XXIII ........................................................................................135

    (Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) et

    seq.)..................................................................................................135

Count XXIV........................................................................................138

    (Michigan Medicaid False Claim Act, M.C.L.A. 400.601 et seq.) .................138

-6-

Count XXV ...................................................................................................140

    (Minnesota False Claims Act, (Minnesota Statutes § 15C.01 et seq.) .............140

Count XXVI ..................................................................................................143

    (Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised

    Statutes § 191.900 et seq.) ........................................................................143

Count XXVII .................................................................................................146

    (Montana False Claims Act, MT ST 17-8-401 et seq.) ...................................146

Count XXVIII ................................................................................................149

    (Nevada False Claims Act, N.R.S. § 357.010 et seq.).....................................149

Count XXIX ..................................................................................................151

    (New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.)............................151

Count XXX ...................................................................................................154

    (New Mexico Medicaid False Claims Act, and New Mexico Fraud Against

    Taxpayers Act, N. M. S. A. 1978, § 27-14-1 et seq., and N. M. S. A. 1978, § 44-

    9-1 et seq.)...............................................................................................154

Count XXXI ..................................................................................................157

    (New York False Claims Act, N.Y. State Fin. Law § 187 et seq.)....................157

Count XXXII..................................................................................................159

    (North Carolina False Claims Act, North Carolina General Statutes § 51-1-605

    et seq.) ...................................................................................................159

Count XXXIII .................................................................................................162

    (Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 et seq.).......162

Count XXXIV ................................................................................................164

    (Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 et seq.) .............164

Count XXXV .................................................................................................167

    (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.)

    ................................................................................................................167

Complaint for Damages and Demand for
Jury Trial

Count XXXVI .................................................................................169

(Vermont False Claims Act, 32 V.S.A. 630 et seq.).........................169

Count XXXVII................................................................................171

(Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1et seq.) 171

Count XXXVIII ..............................................................................174

(Washington False Claims Act, Washington Revised Code § 74 66-005 et seq.)

.........................................................................................................174

REQUESTS FOR RELIEF ...............................................................176

DEMAND FOR JURY TRIAL ..........................................................178

CERTIFICATION THAT VENUE IS PROPER .................................179

-8-

**INTRODUCTION**

Alexander Volkoff, LLC, ("Relator") is informed and believes, and thereon alleges the following Complaint against Janssen Phamaceutica N.V., Janssen Phamaceuticals, Inc., and Janssen Research & Development, LLC, Johnson & Johnson, and Ortho-McNeil, (hereinafter collectively referred to as "Defendants").

1.     Defendant Janssen ("Janssen") is a pharmaceutical company that produces, markets, sells, and distributes pharmaceutical and biological products in the areas of area of immunology, pain management, and infectious diseases among others. Janssen and Defendant Johnson & Johnson ("JNJ") and Defendant Ortho-McNeil ("Ortho-McNeil") co-promote the prescription drug Olysio, or simeprevir, in the United States. Janssen also markets, sells, and distributes the opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic. Additionally, Janssen markets, sells, and distributes drugs for a variety of other uses, such as its other drugs Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica.

2.     The Food and Drug Administration ("FDA") has approved Olysio for the treatment of patients with Hepatitis C. The FDA has approved Nucynta for the treatment of moderate to severe pain acute pain under three (3) months in duration. Other indications for other Defendants' drugs include Levaquin for infections caused by designated, susceptible bacteria; Xarelto for a variety of specific blood thinning purposes; Aciphex for heartburn and reflux; Ultram ER and Duragesic for chronic pain; and Remicade for rheumatoid arthritis, psoriatic arthritis, ulcerative colitis, Crohn's disease, and ankylosing spondylitis. Remicade is also used to treat severe or disabling plaque psoriasis. Also, Elmiron for the relief of bladder pain or discomfort associated with interstitial cystitis; Invokana as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus;

-9-

1  Simponi for the treatment of rheumatoid arthritis, psoriatic arthritis, ankylosing
2  spondylitis, and ulcerative colitis; and Imbruvica for the treatment of mantle cell
3  lymphoma.

4  3.      Olysio is an expensive drug, costing as much as $25,000 per dose. In
5  addition, its market share is inherently limited, since it is approved for use only in
6  patients with Hepatitis C. According to the Centers for Disease Control, there are
7  approximately 17,000 patients newly diagnosed annually with hepatitis C. To
8  overcome these problems and gain a larger market for this drug, Defendants
9  created a plan to illegally market Olysio off-label to treat HIV and renal failure
10 patients, and other uses that are not approved by the FDA.

11 4.      Defendants funneled millions of dollars in unrestricted grant money to
12 physicians in order to encourage them to speak and publish articles supporting the
13 use of Olysio in patients whose cardiovascular event symptoms did not meet FDA
14 criteria for Olysio. Specifically, Defendants targeted, developed, and trained
15 physician "Key Opinion Leaders" ("KOLs"), influential doctors whom Defendants
16 supported monetarily. Defendants, in turn, expected these KOLs to support
17 Defendants' prescription drug use among off-label patient populations. Defendants
18 then pointed to the KOLs' use of Olysio when promoting the drug widely to other
19 physicians throughout the country.

20 5.      Consistent with their scheme to provide illegal incentives to doctors who
21 prescribed Olysio, Defendants also gave kickbacks to physicians for off-label use
22 of the drug, providing the physicians with speaking opportunities, unrestricted
23 educational grants, lavish meals, and honoraria to promote and prescribe Olysio
24 off-label, including paid travel included trips to Las Vegas, Hawaii, Chicago,
25 Dallas, and other locations. At these "fly-to" activities, doctors received paid travel
26 and speaker fees, and/or received speaker training so they could receive additional
27 speaker payments from Defendants in the future. Defendants encouraged the

28

Complaint for Damages and Demand for
Jury Trial

1   physicians' acceptance of the paid travel and speaking fees as a form of quid pro

2   quo for increased sales of Olysio.

3   6.      Additionally, Olysio is not superior to competing, similar prescription drugs

4   on the market, and Defendants' scheme to promote broad off-label use of Olysio

5   among off-label patient populations and to influence studies promoting Olysio for

6   use in such patients is very costly. A 2015 study published in the journal BMC

7   Gastroenterology reveals that Olysio is not a cost-effective treatment compared to

8   older treatments, and that a reduction of thirty percent (30%) or more in cost would

9   be necessary to achieve a cost-effective result (See Exhibit 1).

10  7.      Many of Defendant's drugs have an inherently limited market share, because

11  they are approved for use only in patients with very narrow indications. To

12  overcome these problems and gain a larger market for these drugs, Defendants

13  created a plan to illegally sell and market its opioid drugs Nucynta, Nucynta ER,

14  Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin,

15  Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and

16  Defendants' other drug products to gain market share and formulary status in

17  different territories.

18  8.      In order to increase sales of its opioid drugs Nucynta, Nucynta ER, Ultram

19  ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin,

20  Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and

21  Defendants' other drug products, Defendants have illegally provided monetary and

22  other incentives for physicians who were willing to prescribe the drugs.

23  Defendants trained, managed, and instructed its sales representatives, business and

24  marketing managers, and other executives to offer physicians cash payments,

25  expensive trips and meals, expensive gifts, and entertainment as kickbacks in

26  exchange for the physicians' agreement to prescribe Defendants' opioid drugs

27  Nucynta, Nucynta ER, Ultram ER, Duragesic, and its other drugs Olysio, Xarelto,

28

-11-

Complaint for Damages and Demand for
Jury Trial

1   Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

2   and Imbruvica, and Defendants' other drug products.

3   9.      The pharmaceutical industry is highly regulated by the FDA. Pursuant to the

4   Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, the FDA strictly

5   regulates the content of consumer and physician based advertising, direct to

6   physician product promotion, and drug labeling information used by

7   pharmaceutical companies in promoting and selling-FDA approved prescription

8   drugs.

9   10.     Under 21 C.F.R. § 202.l(k)(2), any brochures, handouts, slide shows or

10  other such promotional materials aimed at physicians are deemed to be "product

11  labeling" and is regulated as such.

12  11.     Under relevant FDA regulations, product labeling must be pre-approved by

13  the FDA and conform to very exacting requirements concerning, inter alia, drug

14  interactions, indicated uses and claims concerning competing products. See 21

15  C.F.R § 201.57.

16  12.     All claims made in any labeling material must be truthful, not misleading

17  and represent a fair balance of the information presented. Any presentations,

18  promotions, or marketing to physicians for products for use other than that

19  approved for labeling purposes by the FDA is considered "off label" marketing and

20  is thus prohibited by FDA regulation.

21  13.     Any failure to fairly and accurately represent the required information about

22  a prescription drug is considered misbranding and is a false and fraudulent

23  statement as a matter of law. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f) and (n);

24  21 C.F.R. § 201.57.

25  14.     Pharmaceutical promotional and marketing materials and presentations

26  lacking in fair balance or that are otherwise false or misleading violate the Food

27  Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, and regulations promulgated

28                                          -12-

hereunder. Such violations exist where promotional and marketing materials and presentations for an FDA approved drug:

    a.    Minimize, understate or misrepresent the risks, contra-indications and complications associated with that drug;

    b.    Overstate or misrepresent the risks, contra-indications and complications associated with any competing drugs;

    c.    Reference "off label" uses of the drug for which it was not an approved indication by the FDA, or expressly or implicitly promote unapproved uses and dosing regimens for which the drug is not indicated;

    d.    Make comparative claims about the drug that have not been demonstrated by substantial evidence, such as comparisons with competing drugs and/or drug indications of patient usage, warnings and safety claims including side effects, physician preference, or

    e.    Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

15.    When Defendants present physicians with false information about off-label use of its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products, and encourage physicians to prescribe and procure those drugs for off-label use uses which are not approved by the FDA or substantiated by any relevant drug compendium, Defendants cause physicians and facilities to submit bills for off-label use of these Defendants' drugs that are based upon fraudulent and misleading statements and are thus ineligible for reimbursement under federal Medicaid, Medicare, and TRICARE programs, and under state health care systems.

-13-

16.     Had the United States and the several States known that the Defendants caused procurement of opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products for off-label uses and also caused those drugs to be prescribed for off-label uses, they would not have provided reimbursement for such prescriptions. This course of conduct violates the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and equivalent state statutes.

17.     Federal laws and regulations governing Medicaid and Medicare and similar state statutes prohibit pharmaceutical manufacturers from providing kickbacks to physicians and medical care providers. Specifically, the federal healthcare anti-kickback provision, 42 U.S.C. § 1320a-7b(b) (2)(B), provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

18.     The Medicare and Medicaid anti-kickback laws, 42 U.S.C. 1320a-7b(b), *et seq.*, regulate drug and device marketing in order to prevent over-utilization of medical care, medication, and medical drugs. Under the anti-kickback laws, companies may not offer or pay any remuneration, in cash or kind, to induce physicians or others to order or recommend drugs or devices which may be paid for by a federal healthcare program such as Medicare or Medicaid. These regulations not only prohibit outright bribes and rebate schemes, but prohibit any

-14-

1   payment, remuneration, gratuities, and other benefits paid by a company to a

2   physician which has as one of its purposes inducing the physician to use the

3   company's products.

4   19.     In addition to the anti-kickback laws, §1877 of the Social Security Act,

5   often referred to as the "Stark law," provides that a physician cannot (1) refer

6   patients to an entity (2) for the furnishing of DHS (designated health services) (3)

7   if there is a direct or indirect financial relationship between the referring physician

8   (or an immediate family member of the referring physician) and the entity, (4)

9   unless the financial relationship fits within one of the specific exceptions in the

10  statute or regulations. *See* 42 U.S.C. §1395nn. Unlike the Medicare Anti-Kickback

11  Statute, which is a criminal statute requiring at least some measure of criminal

12  intent, the Stark Statute is a civil statute requiring strict compliance. Intent to

13  violate or substantial compliance has no bearing on whether an activity is or is not

14  legal. Violation, no matter how unintentional or technical, is sufficient to invoke

15  the Stark Statute. Lastly, if a prohibited referral occurs under Stark, the DHS entity

16  may not file or cause to be filed a claim under Medicare or Medicaid or a bill to

17  any individual, third party payer, or other entity for the designated health services

18  provided.

19  20.     Had the United States and the several States known that Defendants' opioid

20  drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs

21  Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana,

22  Simponi, Elmiron, and Imbruvica, and Defendants' other drug products were being

23  used by facilities because physicians in those facilities had accepted kickbacks

24  from Defendants, the United States and the several States would not have funded

25  these illegal kickbacks after the fact by providing reimbursement for Defendants'

26  drugs.

27  21.     Defendants' conduct occurred while under concurrent Corporate Integrity

28

-15-

Agreements (2010 and 2013) for two (2) separate FDA off-label promotion schemes. The extent of these infractions only indicates that the defendant has no respect for the law and is willing to push legal boundaries in pursuit of corporate profits despite what this may entail for the US government or patients' lives.

22.     Moreover, the kickbacks described in this Complaint are strictly illegal and have had the direct effect of greatly increasing the amount of Defendants' opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs that have been paid for and reimbursed by state and federal governments. Accordingly, the kickbacks have had the indirect effect of increasing the amount of money spent by the federal government and the States for payments and reimbursements covered by Medicaid, Medicare, and the TRICARE health care system for members of the military and their families. Defendants' kickbacks to physicians represent the inducement of payment from the government through a pattern of fraudulent conduct, constituting false claims within the meaning of 31 U.S.C. § 3729 and the relevant provisions of the state false claims and Medicaid fraud statutes. When Relator ALEXANDER VOLKOFF, LLC complained and reported these practices and other illegal and fraudulent practices to Defendants, Janssen retaliated against Relator and then eventually fired Relator.

23.     Relator also alleges violations by Defendants of the California Insurance Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871, *et seq.*; and the Illinois Insurance Claims Fraud Prevention Act ("ILCFPA"), 740 Ill. Comp. Stat. § 92/1, *et seq.*

24.     Both California and Illinois have *qui tam* statutes that permit relators to raise allegations of fraud by individuals or entities against private insurance companies.

-16-

1   The statutes operate similarly to the federal and state FCAs, and are written to
2   prevent fraud occurring in the private health care insurance market.
3   25.   Upon information and belief, Defendants receive significant revenues from
4   private insurers in California and Illinois.
5   26.   Upon information and belief, Defendants are paid by private insurers that
6   cover California- and Illinois-based patients who have been referred for treatment
7   as a result of Defendants' scheme.
8   27.   Upon information and belief, private healthcare insurance companies in
9   California and Illinois require the same conditions of payment and prohibitions
10  kickbacks and off-label marketing found in the Medicare and Medicaid programs.
11  28.   The CIFPA prohibits as unlawful the following:

> ...It is unlawful to knowingly employ runners, cappers, steerers, or other
> persons...to procure clients or patients to perform or obtain services or
> benefits under a contract of insurance or that will be the basis for a claim
> against an insured individual or his or her insurer.

16  29.   The Defendants' kickback scheme also violates Section 1871.7(a) of the
17  CIFPA, Cal. Ins. Code 1871.7(a), and Section 92/5(a) of the ILCFPA 740 Ill.
18  Comp. Stat. § 92/5(a). Defendants have entered into illegal arrangements with
19  physicians that provide financial incentives for the use of their drug prescribing
20  services, resulting in inappropriate claims submitted to private insurers.
21  30.   Under the CIFPA, any interested person may bring a sealed civil action for a
22  violation of Section 187.7 on behalf of the State of California, Ca, Ins. Code §
23  1871.7(e)(1), (2). If the relator is ultimately successful and the District Attorney
24  intervenes in the lawsuit, the relator is entitled to the recovery of fees, expenses,
25  and a relator's share of between 30% and 40% according to the priority specified in
26  the statute. Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I), (IV). If neither the District
27  Attorney nor the Insurance Commissioner intervene and the relator is successful in

28

-17-

Complaint for Damages and Demand for
Jury Trial

1    settling his/her lawsuit or attaining final judgment, the relator may receive between

2    40% and 50% of the proceeds plus costs and expenses. Cal. Ins. Code §

3    1871.7(g)(2)(A).

4    31.    The Illinois Insurance Claims Fraud Prevention Act ("ILCFPA") is similar

5    to the CIFPA. In Section 92/5(a), the ILCFPA prohibits kickbacks and states:

6          ... [I]t is unlawful to knowingly offer or pay any remuneration directly or

7          indirectly, in case or in kind, to induce any person to procure clients or

8          patients to obtain services or benefits under a contract of insurance or that

9          will be the basis for a claim against an insured person or the person's insurer.

10   32.    740 Ill. Comp. Stat. § 92/5(a). If a defendant is in violation of Section

11   92/5(a) or specifically identified corollary criminal code sections, he/she must

12   reimburse three times the amount of money defrauded as well as civil penalties

13   ranging from $5,000.00 to $10,000,00 per fraudulent claim. 740 Ill, Comp. Stat. §

14   92/5(b).

15   33.    Pursuant to Section 15 of the ILCFPA Section 15, an interested person may

16   bring a sealed civil action for a violation of the ILCFPA on behalf of him/herself

17   and the State of Illinois. 740 Ill. Comp, Stat. § 92/15(a), (b). If the State's Attorney

18   and/or the Attorney General intervene in the *qui tam* action, and it is ultimately

19   successful, the relator is entitled to at least 30% of the recovery. 740 Ill, Comp.

20   State § 92/25(a). If neither government entity intervenes and the relator

21   successfully pursues the lawsuit on his/her own, the relator is entitled to recover

22   not less than 40% of the proceeds. 740 Ill. Comp. Stat. § 92/25(b).

23   34.    Relators here are the original sources of the allegations under the CIFPA and

24   ILCFPA.

25

26

27

28

-18-

Complaint for Damages and Demand for
Jury Trial

**PARTIES**

35.     Relator has worked in pharmaceutical sales since 2005, when Relator began working as a sales representative in Los Angeles, California for Janssen, promoting the multiple prescription drugs, including those contained in this complaint.

36.     Relator is a citizen of the United States. Relator has been employed by Defendants and has inside knowledge that is independent of and materially adds to publicly disclosed information regarding Defendants' business related to pharmaceutical products.

37.     The Relator became aware of Defendants' false claim scheme alleged herein due to Relator's position as an original source. The Relator commenced this *qui tam* action against Defendants for the pharmaceutical products at issue based upon Relator's personal experiences and industry insider information. Relator, as an employee of Defendants, had access to pricing, marketing and reimbursement information such as proprietary Defendant computer files revealing the marketing schemes, prices, and volume of sales by Defendants. Relator, as an industry insider, discovered huge profit spreads on the drugs at issue and that the drugs at issue were reimbursed by Medicare, Medicaid, and private insurers for illegal marketing schemes. Relator directly witnessed and observed the Defendants' sale and introduction of the drugs into the stream of commerce. Relator was aware that Medicare and Medicaid intended to reimburse Defendants for drugs based on a belief that the drugs were legitimately marketed and that the drugs were not encumbered by illegal kickback and off-label marketing schemes, when in fact the Defendants heavily influenced sales of the drugs with kickbacks and off-label promotion.

38.     The facts averred in this Complaint are based entirely upon the personal observations of Relator and documents in Relator's possession.

-19-

Complaint for Damages and Demand for Jury Trial

39.    Relator has provided or is providing to the United States Attorney and the Attorneys General of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Vermont, Virginia, Washington, and the District of Columbia a full disclosure of substantially all material facts supporting this Complaint, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and relevant state statutes.

40.    Relator filed the case of *U.S. et al. ex rel. Alexander Volkoff LLC*, Case No. 2:16-cv-06997-RGK-RAO in the Central District of California on September 16, 2016, which was dismissed by the District Court on April 19, 2018, after an Amended Complaint that named "Alexander Volkoff, LLC" as the relator had been filed.  The "Alexander Volkoff, LLC" of that case is the sole member of Alexander Volkoff LLC, and is the insider who worked for Defendants' companies and experienced first-hand all of the facts regarding Defendants' fraudulent schemes as described in both of these cases.  This action arises from an identical set of facts as the previously-filed action.

41.    Janssen N.V. is a corporation organized and existing under the laws of Belgium with its principal place of business at Turnhoutseweg 30, B-2340, Beerse, Belgium.

42.    Janssen Pharm. is a corporation organized and existing under the laws of Pennsylvania with its principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

43.    Janssen R&D is a corporation organized and existing under the laws of New Jersey with its principal place of business at 920 Route 202, Raritan, New Jersey 08869.

-20-

44.    Janssen is a biopharmaceutical company engaged in the manufacture, promotion and sale of pharmaceutical products in interstate commerce regulated by the FDA, which activities are subject to the Food, Drug, and Cosmetic Act ("FDCA"), the Food and Drug Administration Modernization Act ("FDAMA") and regulations promulgated pursuant thereto. Janssen markets, sells, and distributes the prescription drug Olysio, which is indicated in the treatment of certain patients with hepatitis C, and the prescription drug Nucynta, which is indicated in the treatment of chronic pain, Nucynta ER, Xarelto, Ultram ER, Duragesic, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, among other drugs.

45.    JNJ is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

46.    Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. ("JANSSEN PHARM") is a Pennsylvania Corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

47.    Defendant JANSSEN ORTHO LLC ("JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 01, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland, and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

-21-

48.     Since 2005, Defendants have been co-conspirators and co-partners in the production, promotion, marketing, sales, and distribution of its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvicaa, and Defendants' other drug products and are thus jointly and severally liable for the acts described herein related to the production, promotion, marketing, sales, and distribution of these drugs.

## JURISDICTION AND VENUE

49.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. This court has jurisdiction over the state law counts asserted in this Complaint under both 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, because the state claims arise from the same transaction or occurrence as the federal claims and because these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

50.     At all times material to this Complaint, Defendants regularly conducted substantial business within the State of California, maintained permanent employees and offices in California, and made and are making significant sales within California. Defendants are thus subject to personal jurisdiction in California.

51.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district, selling and promoting their drugs to multiple doctors in this district.

/ / /

/ / /

/ / /

Complaint for Damages and Demand for
Jury Trial

## FACTS

### A. Defendants Illegally Promoted Drugs for Dangerous Off-Label Uses.

52.     Defendants created a plan to illegally market Olysio off-label to treat HIV and renal failure patients, and other uses that are not approved by the FDA. Defendants additionally created schemes to illegally market the opioid pain drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, in ways that increased the risk of addiction. Defendants also illegally marketed Xarelto, Levaquin, Invokana, Simponi, and other drugs in dangerous off-label manners.

53.     New pharmaceutical drugs may not be marketed in the United States until the sponsor of the drug has proven to the Food and Drug Administration (FDA) that the drug is safe and effective for specific indications at specified dosages (if applicable). The indications and dosages (if applicable) approved by the FDA are set forth in the product's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to use drugs for indications or at dosages different than those set forth in a product's labeling, the Food Drug and Cosmetic Act prohibits pharmaceutical companies from marketing or promoting approved drugs for uses other than those set forth in the drug's approved labeling. This regulatory structure protects patients and consumers by ensuring that medical companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body.

54.     The Medicaid and Medicare programs also rely on the FDA's findings regarding safe and effective uses for approved drugs. The Omnibus Budget Reconciliation Act of 1990 limited Medicare reimbursement for drugs or devices to "covered outpatient drugs" 42 U.S.C.§ 1396r-8(k)(2)(A). Covered outpatient drugs only include drugs used for "medically accepted indications". A medically accepted indication is a use which has been approved by the FDA or one which is

-23-

1  supported by specific compendia set forth in the Medicare statutes. Until August,
2  1997, none of the compendia referenced in the statutes supported off-label usage of
3  any approved drugs or devices. Even after August 1997, off-label usage was
4  significantly restricted.

5  55.     Off-label use of a medical product refers to the prescription or use of a
6  product in a manner not approved by the FDA. Since Congress passed the Food
7  and Drug Administration Modernization Act ("FDAMA") in November 1997,
8  manufacturers may provide off-label studies to the medical community only if
9  certain conditions are met. Moreover, federal law prohibits manufacturers from
10  promoting off-label uses through physician studies when the investigating
11  physician is not truly independent or impartial, as well as when the physician is in
12  fact an agent of the manufacturer based upon significant financial relationships.
13  See 21 U.S.C. §§ 360aaa *et seq.*

14  56.     Whether a drug is FDA-approved for a particular use will largely determine
15  whether payment for that drug will be reimbursed under the federal and state
16  Medicaid and Medicare programs. Thus, the off-label use of such drugs is not
17  eligible for reimbursement under Medicaid. Likewise, many state health care
18  agencies intend not to reimburse for drugs for off-label purposes because the
19  agencies do not want to spend money on drugs not recognized as medically
20  necessary in sources specified by federal law. Defendants' opioid drugs Nucynta,
21  Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto,
22  Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,
23  and Imbruvica were not eligible for reimbursement from federal or state Medicaid
24  or Medicare programs when prescribed for use in off-label patients.

25  57.     Defendants' conduct caused physicians to submit bills for their drugs that
26  were ineligible for reimbursement under Medicaid and Medicare because the drugs
27  were used for off-label purposes. Defendants' actions caused physicians, hospitals,

28

-24-

1  and clinics to prescribe, purchase and use Olysio. Such prescriptions, purchases

2  and use were not eligible for reimbursement under Medicaid and Medicare because

3  the drugs were for an off-label use. According to Relator, up to ninety-eight (98%)

4  of Olysio use in 2014 was for off-label purposes. Defendants thus caused the

5  submission of false claims for payment of money under the federal Medicaid and

6  Medicare programs and state health care programs.

7  58.     Additionally, the United States military's payments to cover the use of

8  Defendants' opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and

9  its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

10  Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products

11  for off-label patient populations were not eligible for coverage under the

12  TRICARE health care plan for members of the military and their families

13  (formerly known as CHAMPUS), or through direct purchasing by the military. The

14  Department of Defense will generally pay for the costs only of "proven" drugs,

15  meaning drugs that have been found to be "safe and effective" by the FDA. 32

16  C.F.R. § 199.4(g)(15)(i)(A). TRICARE will pay for off-label use of a drug only if

17  the use is determined to be a "medical necessity" and if the program can determine

18  that the off-label use is "safe and effective and in accordance with nationally

19  accepted standards of practice in the medical community." *Id.* TRICARE will not

20  pay for a drug unless "reliable evidence shows that the medical treatment or

21  procedure has been the subject of well-controlled studies of clinically meaningful

22  endpoints". 32 C.F.R. § 199.4(g)(15)(i)(C). The studies Defendants supported to

23  promote the use of Olysio off-label did not meet these standards. Had TRICARE

24  known this, it would not have covered or reimbursed the off-label use of

25  Defendants' opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and

26  its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

27  Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products.

28

Complaint for Damages and Demand for
Jury Trial

59.     In limited situations, investigational drugs may be used by the military. However, whenever a member of the armed forces receives a drug unapproved for its applied use, the member must be given notice and consent to such use. 10 U.S.C. § 1107. In order to waive consent for the purposes of using such an "investigational drug" in battle, the Secretary of Defense must request a waiver from the President. No such waiver was requested for Defendants' opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products.

60.     As described in this Complaint, Defendants have, since at least 2005 through the present, knowingly and intentionally violated the regulatory schemes described above in its marketing of Defendants' products. Defendants knew or should have known that thousands of pharmacies would routinely and necessarily file false claims with the federal government when the pharmacies sought federal reimbursement for its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products. But for Defendants' actions most, if not all, of the false claims for the purchase of Defendants' products would never have been submitted. Although in some cases the pharmacists did not directly contract with the federal government, Defendants were the indirect beneficiary of all of the false claims submissions described in this Complaint.

61.     While all on-label and off-label sales made or effected by the health care providers receiving unlawful kickbacks or engaging in improper self-referral cause false claims to be filed, the unlawful promotion of off-label uses of Defendants' products provides an additional, independent, and, under the circumstances, far more urgent basis for the government to interdict this activity—the public health is

-26-

Complaint for Damages and Demand for
Jury Trial

1    at risk.

2    *i. Defendants' off-label promotion of opioid drugs*

3    62.    Opioid drugs have the potential for patient addiction, abuse, and misuse,

4    resulting in life-threatening overdoses. Defendants downplayed this risk, and

5    marketed the opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, as

6    natural and less addictive than other drugs. Although evidence was building up that

7    long-acting extended release ("ER") opioids should only be used as a last resort for

8    pain management, Defendants ignored the signs and continued to push these highly

9    addictive drugs using misleading terms.

10    63.    Nucynta (tapentadol) is a Schedule II opioid agonist tablet and oral solution

11    first approved in 2008 and indicated for the "relief of moderate to severe acute pain

12    in patients 18 years of age or older." Nucynta is indicated for the treatment of acute

13    pain under three (3) months of duration. The company used multiple approaches to

14    increase market capture of the product. To both market it as a stand-alone short

15    acting medication, in addition to another long acting agent, and in conjunction with

16    Opioid rotation. Until January 2015, Janssen developed, marketed, and sold

17    Nucynta and Nucynta ER, the "extended release" formula.

18    64.    Nucynta ER (tapentadol extended release) is a Schedule II opioid agonist

19    tablet first approved in 2011 and indicated for the "management of pain severe

20    enough to require daily, around-the-clock, long-term opioid treatment and for

21    which alternative treatment options are inadequate." Prior to April 2014, Nucynta

22    ER was indicated for the "management of moderate to severe chronic pain in

23    adults [and] neuropathic pain associated with diabetic peripheral neuropathy

24    (DPN) in adults." The DPN indication was added in August 2012.

25    65.    Ultram ER (tramadol hydrochloride extended release) is a Schedule IV

26    opioid agonist tablet. It was first approved in the U.S. in 1995. Like Nucynta ER,

27    Ultram ER is indicated for "the management of pain severe enough to require daily

28

-27-

Complaint for Damages and Demand for
Jury Trial

1  around-the-clock, long-term opioid treatment and for which alternative treatment
2  options are inadequate."

3  66.    Defendants promoted the dangerous and contraindicated idea that pain
4  should be treated first by taking long-acting opioids like Nucynta ER, Ultram ER,
5  and Duragesic continuously and then by taking short-acting, rapid onset opioids on
6  top of that. Extended release formulas are only indicated where shorter-acting
7  formulas are inadequate. Meanwhile, despite the short acting nature of the drug,
8  the marketing efforts for Nucynta were concentrated on high volume pain
9  prescribers such as pain management specialists and rheumatologist that primarily
10 treat chronic pain patients. Short-acting Nucynta (November 20, 2008) went on the
11 market about three (3) years before the long-acting form, Nucynta ER (August 25,
12 2011). The drug was marketed based on its so-called ascending and descending
13 pathways, part of a claim that the drug was non-addictive, and avoided withdrawal
14 symptoms.

15 67.    While it was once thought that long-acting opioids would not be as
16 susceptible to abuse and addiction as short-acting ones, this view has been
17 discredited by innumerable adverse reaction reports. Since they claimed there was
18 an ascending and descending pathway component to the opioid, the Defendants
19 claimed the risk would be small. The FDA has enacted special risk evaluation
20 mitigation requirements for extended release and long-acting opioids. The FDA
21 has stated that these extended-release opioid drugs represent a significant overdose,
22 addiction, and death problem for large numbers of patients.

23 68.    The emphasis on descending and ascending pathway served to ensure that
24 the risk for addiction was minimal even with long term use, and thus ignoring the
25 potential for addiction, tolerance, and the schedule II nature of the product.

26 69.    Janssen trained, managed and instructed its sales representatives to expand
27 the label by advising physicians to stack Nucynta in addition to other long acting

28

-28-

1    opioids for additional pain relief. Physicians were encouraged to prescribe Nucynta

2    as a part of an "opioid rotation regimen" whereby it is indicated that risk of

3    tolerance would be decreased if the patient rotates through medications. This

4    information is unsubstantiated in literature and there is no indication that adding

5    additional Nucynta on a long acting opioid would be safe and effective for the

6    patient.

7    70.    In 2013, in response to a petition to restrict the labels of long-acting opioid

8    products, the FDA noted the significant risks of opioids, including overdose, death

9    and addiction. The FDA recognized that opioids can cause death, coma, and life-

10   threatening respiratory depression even when properly used under the supervision

11   of a physician. The FDA required that—going forward—opioid makers of long-

12   acting formulations clearly communicate these risks in their labels. The FDA also

13   required the warnings to be placed on promotional and marketing materials for the

14   drugs distributed by manufacturers.

15   71.    Thus, the FDA confirmed that the adverse outcomes from opioid use include

16   death, unintentional overdose, and addiction, and that long-acting or extended

17   release opioids should only be used in cases where other treatments are not capable

18   of achieving the needed effect.

19   72.    Notably, in reaching its conclusion, the FDA did not rely on new or

20   otherwise previously unavailable scientific studies regarding the properties or

21   effects of opioids. The information had been available all along, and Defendants

22   actively concealed it.

23   73.    For example, a 2008 Janssen marketing piece for detailing pharmacists

24   emphasized neuroplasticity, that theoretically someone using Nucynta could

25   change pain chemistry and prevent "neuronal remodeling" to prohibit the

26   progression into chronic pain (See Exhibit 2). Essentially, this is a claim that

27   Nucynta would help patients actually get better, not just treat their pain.  Chronic

28                                        -29-

pain develops when a patient is in pain so long that their brain undergoes "neuronal remodeling" which basically means that the brain resets to be in a pain state constantly. Thus, claiming that Nucynta would prevent this neuronal remodeling implies that Nucynta would somehow address the underlying cause of the pain, which is totally unsubstantiated.

74.     In fact, Janssen denied that Nucynta ER was an opioid, and said it had "weak" mu-opioid activity, and the majority of the pain relief was the result of adjuvant activity from serotonin and norepinephrine re-uptake, rather than any opioid effect.

75.     For example, one 2009 Nucynta promo piece profiles a 40-year-old African American male police officer who was hurt on the job. It recommends Nucynta for lower risk pain relief, due to its treatment of pain "by addressing both ascending and descending pathways" and its combination of "opioid and nonopioid activity in one centrally acting oral analgesic (See Exhibit 3).

76.     Janssen sales representatives were instructed to tell prescribers that Nucynta ER, Ultram ER, and Duragesic, "reach steady state, and essentially there's no dumping of the medication in the central nervous system." This was to indicate that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. Janssen trained and directed its sales representatives to use a similar statement for immediate release Nucynta – a marketing line that it had a "dual mode of action", and that it was safer due to the "neuroplasticity of the brain."

77.     Janssen sales representatives were instructed to emphasize to physicians that the majority of Nucynta's pain relief came from serotonin and norepinephrine, and that it has a weak affinity to mu-opioid receptors. They were told to claim that it was about "1/50[th]" of the effect of morphine on the mu-opioid receptors," and that "it tickles the mu-opioid receptors." This is not true, however, as Nucynta's label

1   notes that the drug contains tapentadol, an opioid agonist and Schedule II

2   substance with abuse liability similar to other opioid agonists, legal or illicit.

3   78.    Nucynta has weak activity on the mų-opioid receptor and achieves the

4   majority of its adjuvant pain relief properties from norepinephrine and serotonin

5   inhibition. This fact was repeated to tout the low potential for addiction to the

6   medication. This is a claim that is not supported by the label and again is used to

7   encourage broad adoption of the medication in patient populations where its use is

8   not warranted and is not deemed safe and effective by the label.

9   79.    Janssen's sales representatives told prescribers that Nucynta's unique

10  properties virtually eliminated the risk of addiction associated with the drug.

11  80.    This marketing exploitation is further supported by the compensation

12  structure of the sales representatives. The representatives were paid by baseline

13  growth of Nucynta prescriptions, not by the number of new prescriptions

14  indicating that the physicians are expected to have their patients on medication

15  above and beyond the on label ninety (90) day period. Since both compensation,

16  and retention of employment were based on the representatives' sales numbers,

17  this put additional pressure on representative to exploit these niches as their

18  employment and livelihood depended on it.

19  81.    In discussions with prescribers, Janssen sales representatives omitted

20  discussion of addiction risks related to many other of Janssen's drugs. Janssen's

21  sales representatives left REMS packages ["REMS" or Risk Management Protocol

22  that is released for opiates] for the physicians without additional explanation of

23  what that necessarily meant for the patient and the physician. In fact, in a Quality

24  Assurance training session the company asserted that this is the package that is

25  necessary for new compounds with no indication that there is an additional risk for

26  addiction may be the actual reason for the REMS program. [Risk Management

27  Protocol that is released for opiates].

28

-31-

82.     Beginning in or about 2008, Janssen trained, managed and instructed its sales representatives to market to prescribers that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug. Janssen told physicians that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug. In discussions with prescribers, Janssen sales representatives omitted discussion of addiction risks related to Janssen's drugs.

83.     Janssen sales representatives told prescribers that Nucynta and Nucynta ER were "weak opioids" in a class of their own, implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to Janssen's drugs. In truth, however, as set out in Nucynta's FDA-mandated label, Nucynta "contains Tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit."

84.     For example, a February, 2009 Janssen coaching sheet for training its sales representatives indicates that the low incidence of nausea and vomiting and the low the incidence of constipation, CNS, dizziness, somnolence and pruritus are important sales messages. Additionally, sales representatives were coached to push the "low discontinuation rates due to" adverse events, and a "low incidence of opiate withdrawal symptoms." (See Exhibit 4).

85.     For example, a document called the "Nucynta Launch Vis Aid – An Annotated Guide" from 2009 was also used to coach sales representatives on their Nucynta messages. This document also promoted the "low composite incidence of nausea and vomiting," low discontinuation rates, and "low incidence of withdrawal symptoms." These statements did not accurately reflect the studies they referenced, which did not address patients on the drug for more than ninety (90) days or with chronic pain – a large target for the Nucynta sales team (See Exhibit 5).

86.     For example, another 2009 sales training booklet, called "Opioid Efficacy Meets Unexpected Tolerability" made the same claims of low rates of

-32-

1  discontinuation, adverse events, and withdrawal symptoms in the same flawed
2  manner based on the same studies (See Exhibit 6).

3  87.    Janssen sales representatives told prescribers that patients on Defendants'
4  drugs were less susceptible to withdrawal than those on other opioids. Janssen
5  sales representatives told prescribers that Nucynta was not an opioid, making it a
6  good choice for chronic pain patients who previously were unable to continue
7  opioid therapy due to excessive side effects. This statement was misleading
8  because Nucynta is an opioid and has the same effects as other opioids.

9  88.    Nucynta IR and ER were combined for payment of sales commissions –
10  Janssen expected patients to be on Nucynta IR long-term, and they were
11  compensating sales representatives based on long-term Nucynta IR prescriptions
12  (Exhibit 7).

13  89.    For example, in or around 2012, on a field ride with the Nucynta Product
14  Director, Haya Teitel, Dr. Avrom Gart asserted that he had a patient that had
15  experienced temporary blindness while on Nucynta. The Marketing Director
16  requested that the representative not report the incident as it would "jeopardize the
17  launch" of the medication. Regardless the representative reported the incident
18  under "visual disturbance." This is parallel to company's overall culture to further
19  expand the indication of the medications while simultaneously reducing the
20  perceived rate of occurrence of side effects to encourage physician's comfort in
21  prescribing medications broadly despite the off-label use and the clinical
22  appropriateness for the patients.

23                    *ii. Defendants' off-label marketing of Olysio*

24  90.    Olysio's FDA New Drug Application ("NDA") number is NDA 205123.
25  The FDA's approved use of Olysio is limited to the treatment of patients with
26  hepatitis C, in combination with Peginterferon alfa and Ribavirin (not alone), not
27  in patients with moderate or severe hepatic impairment or who have previously

28                                     -33-

1  failed on Olysio or other HCV protease inhibitors.

2  91.    In 2014, Olysio was widely prescribed off-label, nearly twenty percent

3  (20%) of the treated genotype 1 patients were receiving a regimen containing

4  Janssen's Olysio, with the majority of these patients being prescribed the off-label

5  combination of Olysio plus Sovaldi with or without Ribavirin. Trending analysis

6  from the previous sampling period shows that off-label prescribing of this

7  combination had more than doubled, with thirty percent (30%) of specialists in one

8  study reporting having patients currently prescribed the regimen (See Exhibit 8).

9  92.    According to marketing data presented at corporate training meetings

10  between the months of November 2013 – November 2014, ninety-eight percent

11  (98%) of Olysio prescriptions were written in an off label manner, for dual therapy

12  based on the COSMOS trial which included only thirteen (13) patients per each

13  arm of the treatment Q80K polymorphism. Those that were suffering from HIV

14  infection would need to take a drug holiday from their current HIV treatment in

15  order to be treated. This was dual therapy instead of the proven and less expensive

16  triple therapy regimen, and also included kidney compromised patients. At least

17  one of these patients has reportedly died as a result of this experimentation (See

18  Exhibit 9).

19  93.    Janssen devised a marketing plan to promote off-label uses of Olysio

20  through promotion of the COSMOS study, and Janssen management disseminated

21  the instructions directly to sales representatives at national sales meetings and

22  through weekly or monthly local sales meetings. Sales representatives were pushed

23  to promote Olysio use as part of an off-label dual-therapy regimen in accord with

24  the COSMOS study, when only a triple-regimen therapy was approved by the

25  FDA. The COSMOS study was therefore distributed and left behind with the

26  physician customers to push the dual-therapy regimen model. Sales representatives

27  were instructed to tell physician customers, "your colleagues are using dual-

28

-34-

Complaint for Damages and Demand for
Jury Trial

1  therapy as described in the COSMOS study" and left the study with the physician.
2  Sales representatives were instructed to tell physicians that patient sustained viral
3  response ("SVR") would be better under a COSMOS model of dual-therapy, and
4  would result in fewer hospitalizations and complications.

5  94.    However, the FDA's approved use of Olysio was limited to the treatment of
6  patients with hepatitis C, in combination with Peginterferon alfa and Ribavirin (not
7  alone), not in patients with moderate or severe hepatic impairment or who have
8  previously failed on Olysio or other HCV protease inhibitors.

9  95.    Meanwhile, the company enjoyed a $2.3 billion windfall as a result of this
10  strategic off label promotion. Defendant JNJ CEO Alex Gorsky addressed the
11  investors that this surplus is a windfall and knowing that the drug simply didn't
12  have the efficacy or the opportunity to compete in the market (See Exhibit 10).

13  96.    The Olysio niches that were to be exploited versus the competition by
14  Janssen sales representatives included combination use with cholesterol lowering
15  medication such as Lipitor (atorvastatin); and renally compromised patients as
16  presented by sales marketing materials that consisted of speaker slide decks that
17  the company prepared for their paid physician speakers, and district business plans
18  from 2013 to 2015 (See Exhibits 11, 12, and 13).

19  97.    Speakers were encouraged to talk about their success with pre and post liver
20  transplant patients, again a population in which the medication has not been proven
21  to be safe or effective. The FDA indicated that this usage with patients on
22  concomitant cholesterol lowering medication is not deemed safe or effective and in
23  fact seven (7) patients were reported injured as a result. Despite this, Defendants'
24  sales representatives were pushed to actively promote this use (See Exhibit 14).

25  98.    Speakers were expected to set up a friend in the audience at Olysio dinners
26  to ask about off-label use, giving the speaker the opportunity to answer in a way
27  that promoted the off-label, dual-therapy regimen with Olysio that was in accord
28

-35-

with the COSMOS study. If no one in the audience remembered to ask about off-label use, then the Janssen sales representative was expected to ask a question about off-label use to give the speaker the opportunity to promote Olysio off-label.

99.     These experimental regimens not only endangered the patient, they also caused an unhealthy cost burden to the healthcare system.

100.   For example, Defendants had Dr. Tram Tran moderate a Newport Liver society meeting (See Exhibit 15). Dr. Tran was overheard by Relator asserting that the cost of re-treating Hepatitis-C patient failures on this experimental system is nearly $1 million dollars.

101.   It is important to note that the Olysio sales team was using the term "spontaneous" as a euphemism for "off-label sales." Sales representatives were following the "spontaneous users" (off-label prescribing physicians) very closely, as were sales managers and National Sales Director Bill Whyte.

102.   For example, in a document regarding a "field ride" with Janssen sales manager Mo Issa, a sales representative noted that he was taking Issa to visit three (3) of the top Olysio prescribers in his territory, all of whom were using Olysio in the "spontaneous" manner. This showed the focus of Ron Lloyd and his manager on increasing the business with these "spontaneous" off-label prescribers (See Exhibit 16).

103.   For example, in a September 16, 2014 document, Janssen National Sales Director Bill Whyte instructed a sales representative to take him to see Dr. Tong and Dr. Mena at their liver transplant center. Dr. Tong and Dr. Mena were using Olysio off-label for their liver transplant patients, and the document made note of their high prescribing volume of Olysio and Sovaldi, and their status within the company as "KOL & National Speakers." The document noted that Dr. Tong and Dr. Mena are "using spontaneous use of Olysio" (See Exhibit 17).

104.   Dr. Myron Tong is a liver center doctor at Pasadena Liver Center who works

-36-

Complaint for Damages and Demand for
Jury Trial

with Dr. Edward Mena. In 2015, Relator was reprimanded by her Janssen sales manager Tyana Grant for not helping Dr. Tong to pull through an insurance payment approval on a genotype-2 patient (Olysio was only indicated for hepatitis C, Genotype 1). Relator refused to participate due to her concerns about the safety of this off-label use. Dr. Tong wanted this treatment for one specific patient. Dr. Tong asked Relator to work with CVS pharmacy, and to pass information to the pharmacy and to help with the pull through on the insurance prior authorization requirement on that patient. Relator refused to do the off-label pull-through, and so was reprimanded by her manager Tyana Grant, on orders from her regional manager Mo Issa. Mo Issa claimed that Relator was not working hard enough and needed to do this pull-through. Relator defended Relator's self by saying that what Dr. Tong was intending to do was off-label and potentially dangerous, and Relator did not feel comfortable assisting him. Manager Tyana Grant told Relator that she was hearing several similar complaints from other doctors where Relator was unwilling to do the prior authorization work they required on their off-label prescriptions.

105.   From 2014-2015, Dr. Myron Tong wanted Relator to invite every possible doctor to his speaker programs, but no more than ten (10) doctors would show up. Dr. Tong specifically requested the Asian community physician attendees, but they were outside Relator's territory. Dr. Tong wanted these doctors to attend his speaker programs because they were potential referral partners for him. Dr. Tong would sometimes shout at the Relator that Relator was not getting enough people to his speaker programs.

106.   Defendants continue to promote Olysio for use in off-label patient populations, even in the face of evidence that such use led to an increased risk of adverse events and even death. In fact, upon information and belief, Janssen continues to promote Olysio for off-label use in off-label patient populations in the

-37-

1    same manner as set forth in this Complaint today.

2    107.   Given these risks, it is difficult to see how the benefits of using Olysio for

3    patients with HIV and renal failure or other off-label indications for Defendants'

4    drugs outweigh the risks.

5              *iii. Defendants' off-label marketing of Xarelto*

6    108.   Xarelto (rivaroxaban) is advertised as a wonder drug — a "next generation"

7    blood thinner to replace warfarin for prevention of blood clots and stroke.

8    Unfortunately, Xarelto's makers chose not to warn that the drug also causes

9    uncontrollable internal bleeding that may lead to death. That calculated decision

10   has led to hundreds of deaths and many more injuries.

11   109.   Janssen minimized the need for an antidote indicating that Coumadin is an

12   old paradigm that needed to be changed. True to its core business strategy, Janssen

13   has positioned Xarelto as the #1 NOA [Novel Oral Anti-coagulent] in the market,

14   expanding the label and minimizing the potential side effects of this dangerous

15   drug. Since the launch of Xarelto, hundreds of patients have died as a result of

16   irreversible internal bleeds.

17   110.   The U.S. Food and Drug Administration (FDA) has approved Xarelto for a

18   number of specified uses, including: For hip and knee replacement patients, to

19   avoid and treat deep vein thrombosis (DVT) and pulmonary embolism (PE); and

20   for nonvalvular atrial fibrillation (NVAF) patients, to minimize the risk for stroke.

21   111.   However, Defendants promoted Xarelto off-label in that it was not indicated

22   for medically ill patients. Defendant had employees calling on hospitals and

23   hematologists, whereas cardiologists and general practitioners and internists would

24   have been the appropriate, on-label targets. Defendants minimized the bleeding

25   deaths in the trials, and told doctors that there was no problem with reversal of the

26   bleeding problem, "because we aren't seeing a bleeding problem."

27   112.   There were twenty-two (22) deaths at the end of one Xarelto trial that

28
                                    -38-

Defendants claimed were due to inaccuracy of the trial design. Additionally, Janssen chose to aggressively market to patients on dialysis and medically ill patients despite the fact that the FDA did not grant this label exception. Janssen extensively targets oncologists and nephrologists although the safety and efficacy has not borne out Xarelto's use in these patients.

113.    Before Xarelto and other blood thinners like it came on the market, doctors prescribed Warfarin (Coumadin) or heparin. The problem with Warfarin is that users must take the drug at mealtime, eat a limited diet and have their blood monitored frequently. These restrictions are unnecessary with Xarelto, as Janssen claims. But Xarelto can cause bleeding, and once bleeding starts, Xarelto does not have a simple method of stopping it. In this way, Xarelto is more dangerous than Warfarin, where internal bleeding can be quickly stopped with vitamin K or plasma.

114.    Janssen also directed that Xarelto be actively promoted to oncologists, nephrologists and hematologists, although there is no indication for medically ill patients (See Exhibit 18).

*iv. Defendants' off-label promotion of Levaquin*

115.    Levaquin (levofloxacin) is an antibiotic in the fluoroquinolone class, indicated in adults (≥18 years of age) with infections caused by designated, susceptible bacteria. It is indicated for: Pneumonia: nosocomial and community acquired; Acute bacterial sinusitis; Acute bacterial exacerbation of chronic bronchitis; Skin and skin structure infections, both complicated and uncomplicated; Chronic bacterial prostatitis; Urinary tract infections, both complicated and uncomplicated; and for Acute pyelonephritis Inhalational anthrax, post-exposure. It is also indicated for plague.

116.    However, the FDA issued a drug safety alert that the agency is requiring the manufacturer of the antibiotic Levaquin (levofloxacin), Ortho-McNeil-Janssen

-39-

Complaint for Damages and Demand for
Jury Trial

1  Pharmaceuticals, and of other fluoroquinolone drugs revise the labeling to warn
2  patients of the risk of serious side effects including nerve damage. Previously,
3  these drugs were implicated in tendon tears and ruptures in the arms and legs, also
4  serious injuries and heart damage including aortic dissection.

5  117.   Defendants misrepresented the risk of tendon tears to physicians, telling
6  them only 1 in 10,000 patients had tendon ruptures (Achilles tendon tears were the
7  more common). Sales representatives were told and directed to make it sound as
8  safe as drinking coffee.

9  118.   Defendants required representatives to sell Levaquin for all anti-biotic
10 purposes, as a much stronger anti-biotic than Cipro. At the Defendant's urging,
11 physicians were using to it off-label for all sorts of antibiotic purposes, and quite
12 commonly for upper respiratory infections.

13 119.   Levaquin is used for mild upper respiratory infections such as acute
14 bronchitis, which is usually a self-limiting disease. Defendants touted Levaquin as
15 the work-horse quinolone antibiotic; safe and effective for use in both upper
16 respiratory and genitourinary infections. While many doctors and thousands of
17 patients have complained about the many adverse events associated with this
18 strong medication, Janssen decided to push the envelope with this medication and
19 encouraged doctors to use it as their go-to broad spectrum antibiotics from minor
20 urinary tract infections to upper respiratory infections despite the danger of
21 developing antibiotic resistance strains of bacteria, and despite the many reported
22 side effects reported by the patients that the company has treated dismissively.

23 120.   Levaquin targets DNA gyrase and Topoisomerase 4 and as a very strong
24 antibiotic, Janssen used this platform to falsely indicate that the development of
25 resistance to this antibiotic is extremely low. This has not borne out in any clinical
26 study, local antibiograms nor has it been substantiated by the CDC as a means to
27 lower the incidence of MRSA. The indiscriminate use of this strong antibiotic in

28

-40-

1  fact may have contributed to the rise of MRSA in the local and national

2  community.

3  121.   Additional, undisclosed adverse effects of Levaquin included patients who

4  were "floxed" – since Levaquin is a chemotherapy agent, it deactivates two points

5  in cell replication, targeting the DNA. Physicians were told that it targets the

6  bacterial DNA not the human DNA, and that widespread off-label use would

7  therefore be safe.

8  122.   Patients who have been "floxed" have routinely reported suffering adverse

9  effects such as widespread bodily pain, fatigue, muscle weakness, muscle

10  twitching, muscle wasting, gait disturbances, severe balance issues, stiffness,

11  spasms, joint pain, tendon issues, seizures, tremors, numbness, burning, tingling,

12  fasciculation, spasticity, nerve damage, autonomic issues, voice issues, exercise

13  intolerance, difficulty swallowing, slow digestive motility, abdominal pain, acid

14  reflux, gastritis, nausea, constipation, diarrhea, colitis, cognitive impairment,

15  memory impairment, cardiac issues, urinary issues, kidney damage, liver damage,

16  pancreatic damage, thyroid abnormalities, hair loss, glucose issues, respiratory

17  issues, emotional issues, depression, psychosis, depersonalization, dissociation,

18  anxiety, insomnia, abnormal dreams, suicidal thoughts, thought alterations,

19  agitation, fatigue, dizziness, inability to concentrate, panic attacks, difficulty

20  communicating, forgetfulness, bruising, vision issues, hearing issues, tinnitus,

21  dental issues, gum issues, skin issues, rashes, multiple chemical sensitivity, sexual

22  dysfunction, reproductive issues, and DNA damage.

23  123.   Defendants warned the FDA that the drug's adverse reactions also included

24  abnormal heart rhythms known as arrhythmias in addition to existing concerns

25  about heart problems and the potentially deadly Stevens Johnson Syndrome that

26  has dogged Zithromax for some time. However, the Defendants have not

27

28

Complaint for Damages and Demand for
Jury Trial

1    adequately addressed the adverse events of the "floxed" patients in the drug's
2    labeling, or adequately begun warning doctors against its continued off-label use.
3    124.   In fact, the Defendants minimized the potential for tendon rupture and did
4    not disclose the thousands of permanent or otherwise persistent neurological side
5    effects that have been reported by many patients since launch. The company
6    marketing team asserted that the risk for developing a tendon injury is less than
7    one in 10,000 patients, that this is a class effect, and that in fact the large majority
8    the cases are because of competing antibiotic drug Cipro. Thereby Defendants
9    minimized the true side effects of this powerful agent that also has acted as a
10   chemotherapy agent and a DNA disruptor.
11   125.   Relator is aware of one physician named Dr. James Jung who reported to
12   Relator and a sales manager that he personally suffered paralysis as a side effect of
13   Levaquin, and another physician named Dr. Spira who reported that he personally
14   suffered a ruptured tendon as a side effect of Levaquin. In each case, Defendants'
15   sales managers told Relator that the side effects would not be reported to the FDA,
16   as the managers felt they were unrelated to the drug.
17              *v. Defendants' off-label promotion of Invokana*
18   126.   Invokana (canaglifozin) is indicated for treatment of type 2 diabetes.
19   Defendants downplayed the risk of foot and leg infections. Diabetes patients are
20   already at risk of developing foot and leg infects. In 2016, the FDA updates the
21   Boxed Warning to warn that Invokana doubled the risk of foot and leg infections.
22   127.   Defendants also downplayed the side-effect risk of yeast infections with
23   Invokana, which was a significant risk because diabetes patients are already more
24   susceptible to yeast infection.
25   128.   Defendants also promoted Invokana off-label as a weight loss drug, without
26   scientific support.
27   / / /
28
-42-

1            *vi. Defendants' off-label promotion of Simponi*

2    129.   Defendant drug Simponi was indicated for a number of conditions, including

3    ulcerative colitis. Janssen promoted it off-label to treat all other inflammatory

4    bowel diseases (which are autoimmune diseases), rather than just ulcerative colitis.

5    Other inflammatory bowel diseases Simponi was promoted for off-label include:

6    Crohn's, Behcet's, diversion colitis, microscopic colitis.

7            *vii. Defendants' scheme to get off-label drug uses covered by*

8                 *insurance.*

9    130.   Defendants trained sales representatives on off-label and kickback-based

10   sales in "best practices meetings" which occurred at every national sales meeting.

11   Sales representatives were put through intensive training called "grinders," "round

12   robin," and "role playing" at these sales meetings, and Defendants paid doctor

13   customers to do the role playing during the sales training. Physicians were offered

14   free travel and one day of pay to participate in the role playing.

15   131.   Defendants' sales representatives and Medical Science Liaisons ("MSL")

16   were trained to use knowingly off-label information to persuade physicians to use

17   Defendants' drugs. Defendants trained and directed sales staff to tell doctors that

18   Defendants' drugs are effective for a variety of off-label claims; none of which

19   were indications which the FDA had approved for Defendants' drugs. These

20   efforts were successful to promote the drug off-label. Collaboration with MSLs

21   was utilized as a means to expand and extend the label and make the physicians

22   comfortable with extensive off label use (98% in 2014 in combination with

23   Sovaldi).

24   132.   Collaboration also occurred between Janssen sales representatives and

25   pharmacists at various specialty pharmacies in order to pull-through off-label

26   prescriptions. "Pull-through" is the process by which a drug company sales

27   representative induces the physician, the physician's staff, the pharmacists, and the

28

-43-

Complaint for Damages and Demand for
Jury Trial

1    pharmacists staff to submit paperwork to overcome prior authorization or other

2    roadblocks to getting a prescription filled.

3    133.    Janssen sales representatives were given lists of pharmacies and specialty

4    pharmacies in their area to induce with lunches, meals and gifts in order to get their

5    agreement to work collaboratively on the pull-through efforts. Janssen sales

6    managers tracked the efforts of sales representatives to call on the pharmacies with

7    inducements in order to establish the relationships, and to follow up with them to

8    get them to follow up on prior authorization paperwork from insurance companies

9    to get drug prescriptions approved.

10   134.    At Olysio dinner speaker presentations in 2014-2015, Janssen employees

11   were instructed by Defendants' sales managers to invite sales representatives from

12   the specialty pharmacy that helped fill the Olysio prescriptions. These specialty

13   pharmacy sales representatives were also encouraging off-label discussions about

14   Olysio and the COSMOS study. The specialty pharmacy sales representatives were

15   much more aggressive in pushing off-label uses for Olysio to the doctors.

16   Accordingly, Janssen sales managers preferred to have specialty pharmacy sales

17   representatives attend their Olysio meetings.

18   135.    For example, in October, 2014 a presentation was given at a Janssen meeting

19   for physicians at a Newport, California meeting by Rafael Marfil (See Exhibit 19).

20   Mr. Marfil was the Sendera pharmacy founder, and he expressed the critical nature

21   of the leverage between the representative and the pharmacy in order to pull

22   through the medication. In this presentation, the representative demonstrated that

23   when he has a difficult prescription (off-label prescription) to pull-through past the

24   insurance company prior-authorization obstacles, he calls the pharmacy where the

25   prescription is supposed to be fulfilled. The pharmacy then reached out to the

26   insurance company and had a variety of template studies that are attached to each

27   in order to obtain the prior authorization for each off-label prescription. This

28   -44-

relationship and collaboration is essential in procuring such a large percentage of medications that are cost prohibitive and not on the drug formularies. This scheme is similar to the off-label promotion scheme that was promoted for use by Defendants' Olysio sales representative in February, 2015 as a "Success Story" with Dr. Victor Machicao at the University of Texas for his liver transplant patients with acid reflux problems (See Exhibit 20).

136.   For example, in December, 2014, Janssen sales representatives were given information from Defendants to provide to doctors promoting the use of Olysio off-label for HIV, post-liver transplantation and renal failure patients. The information was included in a Janssen letter to physicians which was supposed to be used only for unsolicited requests for off-label information from physicians. However, Defendants' District Managers routinely ordered sales representatives to make available off-label information to hospitals and physicians in order to realize a boost in sales, and in order to get Defendants' MSLs invited to give additional off-label information to doctors promoting the use of Olysio for HIV and renal failure patients (See Exhibit 21).

137.   Janssen had established a "closed network" of specialty pharmacies for the sale of the drug Simponi, and the Olysio sales force was instructed to use this closed network for Olysio. Furthermore, the Olysio sales force was instructed to nominate local specialty pharmacies for inclusion in the closed network.

138.   For example, one Janssen sales and marketing document notes that the sales representative worked closely with Janssen's Rich Appiah to get two local specialty pharmacies approved for the Simponi closed network "which enables full portfolio coverage with both Olysio & Simponi and expanded relationship and opportunity for local area pharmacies" (See Exhibit 22).

139.   For example, a Janssen sales and marketing email stated that Janssen had speakers from Sendera Specialty Pharmacy come to a Janssen sales meeting to

-45-

1  train sales reps on collaborating more closely on pulling-through the Olysio

2  prescriptions (See Exhibit 23).

3  140.   Janssen Senior Training Manager for Sales and Development, Policia Perez

4  instructed all sales representatives to collaborate with Medical Science Liaisons

5  ("MSLs") to work on pull-through of the off-label Olysio prescriptions. MSLs

6  were Janssen employees who were supposed to respond to physician requests for

7  off-label information, but Janssen developed a scheme to use them as a more

8  aggressive part of the sales force and instructed sales representatives to set

9  meetings for them to promote off-label uses to pharmacy staff and physicians (See

10  Exhibit 24).

11  141.   Janssen incentivized sales representatives to induce pharmacies and

12  specialty pharmacies to help with prescription pull-through. Nearly all Olysio sales

13  that were reported by specialty pharmacies were being "allocated" to the

14  responsible Janssen rep for commission credit.

15  142.   For example, a November 2014 email among Olysio sales staff discussed the

16  allocation of Premier Specialty Pharmacy sales among local sales reps (See Exhibit

17  25).

18      *viii. Defendants sponsored seminars, symposia, and other continuing*

19      *medical education programs that promoted the off-label use of their*

20      *drugs*

21  143.   Specifically, as part of its scheme to promote its opioid drugs Nucynta,

22  Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto,

23  Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

24  and Imbruvica, and other Defendants' drugs widely for use to treat off-label patient

25  populations, Janssen sought out influential physicians and proffered kickbacks to

26  them in return for conducting research and implementing policies promoting the

27  use of Defendants' drugs in those off-label cases. As set forth below, most of this

28

-46-

"research" consisted of paying a physician to prescribe Defendants' opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs and report some simple findings. The Janssen marketing department made the decisions on which doctors to pay to do case studies and be involved in research protocols based on their drug prescribe volume, showing that Janssen was not paying those doctors for a legitimate research purpose. In effect, Janssen paid these influential physicians to prescribe their patients with Janssen drugs in order to expand its market share. Janssen also paid these "Key Opinion Leaders" and "Champions" to promote the use of opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica at seminars and other events for referring cardiologists, clinic staff, and prescribing drugs in patients.

> *ix. Defendants provided financing and other support for questionable research to support and promote the use of their drugs in off-label patient populations.*

144. Defendants engaged in a researching and publishing campaign under which it paid physicians to engage in off-label studies of Olysio in HIV and renal failure patients, and other uses, along with off-label uses of Levaquin, Xarelto, Nucynta, and other Defendants' drugs. These studies were heavily influenced by bias, since the physicians were paid by Defendants; the research was often coordinated by Defendants; and in many cases, Defendants' employees were included as researchers on the projects. In sum, Defendants deliberately pursued a scheme under which they paid for biased research and studies to support the use of Olysio off-label in HIV and renal failure patients, and other off-label uses for Levaquin, Xarelto, Nucynta, and other Defendants' drugs.

Complaint for Damages and Demand for Jury Trial

145.   Defendants used a speaker program to promote the drug Elmiron. Notably, Defendants paid the developer of the drug, Dr. Lowell Parsons from San Diego, to appear as a promotional speaker. Dr. Parsons is not in-house at Janssen, so when he spoke at these paid events, he had the appearance of being a credible or neutral third party, when in fact he was making a speaker fee, and probably royalties from the sale of the drug.

146.   Defendants also ran a number of nationwide studies which engaged a large number of investigators, each of whom enrolled a few patients each, and for which doctors were remunerated up to several thousand dollars per enrolled patient, in order to create brand loyalty with the physicians, often for off-label uses.

147.   Defendants' research and publication campaign had a clear purpose: to support and promote the off-label use of Olysio for HIV and renal failure patients, and other off-label uses for Nucynta, Nucynta ER, Xarelto, Ultram ER, Duragesic, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs.

**B.**   **Defendants Illegally Promoted Use of Their Drugs by Providing Kickbacks to Physicians and Researchers.**

148.   Defendants used illegal kickbacks and quid pro quo arrangements to ensure that physicians would continue to prescribe Defendants' drugs. None of these incentives have anything to do with true scientific or medical research or with the safety of patients. These incentives include cash payments to "consultants" and "preceptors," cash payments for a "speaker's bureau" and to national and regional "advisory boards" and for participation in teleconferences, post-market research, "case studies," as well as the other activities described herein.

149.   Advisory boards were completely overseen by Defendants' marketing department. Marketing would invite the speakers and nominate the members of the advisory boards. With Olysio for example, they met at least three (3) times a year,

-48-

1    normally in Chicago and Los Angeles. Physician's travel was paid, and they were

2    paid for participating, at least $1500.

3    150.    Defendants rewarded doctors with many of these kickbacks for prescribing

4    large quantities of its opioid drugs Nucynta, Nucynta ER, Ultram ER, and

5    Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade,

6    Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other

7    Defendants' drugs. Some doctors, who prescribed a large number of Defendants'

8    drugs, were given gifts including expensive meals. Defendants also expected sales

9    representatives to supply some doctors with wine and alcohol at dinner. Relator has

10   personal knowledge of alcohol provided at dinners.

11   151.    Relator also has personal knowledge of at least one of the Defendants'

12   speaker program dinners at which some attendees used cocaine, as well as an

13   illegal sales and marketing scheme whereby physicians in the Korea Town area of

14   Los Angeles were frequently taken to a "spa" for prostitution services that were

15   paid for by Defendants' sales representatives using corporate credit cards and/or

16   other corporate entertainment funds. Relator was also aware of a physician in

17   Korea Town who was paid over $100,000 by Defendants in 2009 for an office

18   remodeling project.

19   152.    Defendants established formal internal guidelines for the award of these

20   benefits to physicians, in effect pushing "prescribe to play," quid pro quo-focused

21   sales strategies which are based entirely on the amount of prescriptions written by

22   the physicians and the ability of the physician to influence other physicians to

23   begin prescribing Defendants' drugs. The recipients of these awards and benefits

24   were selected by Defendant marketers based on the recipients' ability to prescribe

25   its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other

26   drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

27   Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs, and to

28

-49-

1  influence other doctors to do so.

2  153.   Some doctors demanded payment from Defendants as a speaker, a
3  researcher in order to use Defendants' drugs, or demanded Defendants pay for
4  lunch or dinner for the physicians' entire office or the physicians' friends.
5  Defendants' managers generally agreed to pay, and instructed sales representatives
6  to arrange the paid activity for the doctor. Defendants' sales representatives were
7  then responsible for following through to ensure that Defendants generated its
8  opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs
9  Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana,
10  Simponi, Elmiron, and Imbruvica, and other defendant drug sales based on the
11  provision of the quid pro quo payment.

12  154.   Paid speakers received increasing amounts of money over time with Janssen,
13  starting from $1,000 per talk in relator's early years with the company to $3,000
14  per talk near the end. As long as the money was in the budget, Janssen pushed its
15  sales representatives to pay for speakers in order to entice them to prescribe more
16  drug.

17  155.   As a result of this pressure and despite continual objections by Janssen sales
18  representatives that there were no additional **educational** needs in the market for
19  Olysio, the Janssen Regional Business Director and District Manager kept
20  continual tabs of speaker programs and measured how many speaker programs
21  each district or sales representative conducted. The sales representatives
22  continually echoed that, since the medication is no longer in the launch mode and
23  the majority of physicians are well trained, "there is no longer an educational need
24  for the dinners." Due to increasing management pressure and the deleterious
25  effects on employment, these dinners were conducted on nearly a weekly basis, in
26  an expensive restaurant to allure and entertain physicians.

27  156.   Often the physicians attending were friends, colleagues or referral partners

28

-50-

Complaint for Damages and Demand for
Jury Trial

and this was no more than a social event, an opportunity to have a referral dinner and enjoy some entertainment provided to them by the Defendant.

157.   For example, a speaker dinner with Dr. Edward Mena was held on approximately Jan. 18th or 19th, 2015 at Hakafan restaurant in Beverly Hills, at a program being run by Janssen sales rep Manisha Jaishangani. Relator was present, and noted that Dr. Edward Mena had brought his manicurist girlfriend, and she was eating and expensing it to Janssen. This was a violation of the Janssen policy on not paying for girlfriends, wives and families of doctors. However, no one at Janssen was allowed to tell a doctor that their family members had to leave a meeting, so Dr. Mena's girlfriend was allowed to stay and eat and expense it to Janssen.

158.   To make matters worse, the Janssen Regional Business Director requested a roster of favorability of speakers. This scoring system highlighted the physicians who wrote a higher volume of prescriptions, and who spoke favorably about various niches where they used the product. The sales representatives were expected to use these physicians as speakers most frequently, and this speaker program thereby provided a reward for their increased utilization. Those that were strictly using Janssen drugs on-label were considered "neutral" or "unfavorable" and the sales representatives were instructed to use them less often (See Exhibit 26, 27).

159.   For example, a February 22, 2008 Janssen business plan said that Janssen sales representatives were to "Target speaker programs for aciphex and levaquin for highest opportunity physicians" (See Exhibit 28).

160.   For example, an April 5, 2015 email promotes two physicians who are Olysio speakers who show "Extensive experience with our regimen, and actively prescribing to date" and are "passionate" advocates (See Exhibit 29).

161.   Around December, 2014, Defendants' business conduct worsened when a

-51-

Janssen District Manager wrote a scathing internal Janssen email about a speaker's presentation. The District Manager wrote about Dr. Sammy Saab, who was asked at one Janssen sponsored dinner what his "go-to prescription" was. Dr. Saab asserted that he uses competing drug Harvoni, and uses the combination as a secondary agent (See Exhibit 30). The Janssen Regional Business Director then requested that the Relator approach and shakedown the physician and confront him by saying, "for someone that we have spent so much marketing money, why is he writing so few scripts?" He further continued "if we are to continue using him he would need to use our product extensively."

162.   On the other hand, Defendants gave handsome rewards to doctors who prescribed a high volume, and the sales representatives who worked with those doctors.

163.   Defendants' drug Aciphex was abused by sales representatives as part of a sales scheme to get prescriptions paid for by insurance without even having actual patients taking the drug. Doctors wrote prescriptions for patients who did not need the drug. Janssen issued "7 day savings cards" to the sales representatives. The reps took these cards, along with the patient prescriptions, to the pharmacy, got the prescriptions filled, then delivered the filled prescriptions back to the doctors' office. This was a way for reps to get huge sales numbers, and for the doctors to get credit with Janssen, without patients ever having to pick up the drug. No patients consented for this.

164.   For example, Dr. Simon Chan had prescriptions for four thousand (4000) Aciphex patients, a completely disproportional number to the size of his practice. Many or most of these prescriptions were paid for by Medi-Cal. Sales representative Amy Chun won a "President's Circle" award from Janssen because her sales numbers were so high as a result of this scheme.

165.   To build and maintain sales relationships, Defendants bought meals for

Complaint for Damages and Demand for
Jury Trial

doctors and their staff. Dinners were about once per week; lunches were every day. Most of the time, the restaurant would bring in the food, but sometimes the reps had to bring in the food. A lot of the offices needed two different foods – kosher for the doctors, and non-kosher for the staff. Offices were also brought ice cream, pizza, breakfast, and other treats on a consistent basis (See Exhibit 31).

166.   For example, from May 19, 2005 through October 13, 2005, Janssen provided fifty-four (54) lunches and fifteen (15) dinners to doctors in the Cedars territory, and paid three doctors as speakers to promote Aciphex and Levaquin (See Exhibit 32).

167.   For example, on March 25, 2013, Janssen paid $134.82 for lunch for Dr. James Jung's office from Chosun Galbee Restaurant in Los Angeles (See Exhibit 33).

168.   For example, on April 2, 2013, Janssen paid $69.26 for lunch for Dr. Sharim's office from Shah Abbas Restaurant in Beverly Hills (See Exhibit 34).

169.   For example, on March 29, 2013, Janssen paid $79.97 for lunch for Dr. Sharim's office from Beach House Restaurant in Hermosa Beach (See Exhibit 35).

170.   For example, on March 26, 2013, Janssen paid $66.63 for lunch for Dr. Nassir's office from Real Food Daily Restaurant in Los Angeles (See Exhibit 36).

171.   For example, on March 20, 2013, Janssen paid $130.80 for lunch for Dr. Nusinovich's office from Fresh Corn Grill Restaurant in West Hollywood (See Exhibit 37).

172.   For example, on March 12, 2013, Janssen paid $260.38 for lunch for a doctor's office from a restaurant in Los Angeles (See Exhibit 38).

173.   For example, on November 2, 2011, Janssen paid $138.59 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 39).

174.   For example, on January 12, 2012, Janssen paid $210.00 for lunch for a doctor's office from Armai restaurant in Los Angeles (See Exhibit 39).

-53-

Complaint for Damages and Demand for
Jury Trial

175.   For example, on January 12, 2012, Janssen paid $168.10 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

176.   For example, on December 20, 2011, Janssen paid $229.00 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

177.   For example, on January 25, 2012, Janssen paid $207.21 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 39).

178.   For example, on February 2, 2012, Janssen paid $194.00 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 39).

179.   For example, on February 7, 2012, Janssen paid $142.00 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

180.   For example, on February 10, 2012, Janssen paid $114.90 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

181.   For example, on April 6, 2012, Janssen paid $210.00 for lunch for a doctor's office from Armai restaurant in Los Angeles (See Exhibit 39).

182.   For example, on April 11, 2012, Janssen paid $170.89 for lunch for a doctor's office from Sharky's restaurant in Beverly Hills (See Exhibit 39).

183.   For example, on April 27, 2012, Janssen paid $150.95 for lunch for a doctor's office from California Pizza Kitchen in Los Angeles (See Exhibit 39).

184.   For example, on May 9, 2012, Janssen paid $1,866.40 for dinner for a doctor's office from Siene Bar and Grill restaurant in Beverly Hills (See Exhibit 39).

185.   For example, on December 8, 2011, Janssen paid $1,346.47 for dinner for a doctor's office from Wolfgang's Steakhouse restaurant in Beverly Hills (See Exhibit 39).

186.   For example, on April 18, 2012, Janssen paid $1,161.14 for dinner for a doctor's office from Il Covo restaurant in Los Angeles (See Exhibit 39).

187.   For example, and particularly, attached as an exhibit are photographs

Complaint for Damages and Demand for Jury Trial

1   illustrating some of the Defendants' speaker programs, the high usage of alcohol at

2   some of the Defendants' funded events, birthday parties for doctors and their

3   medical staff paid for by the Defendants, and catered lunches that Defendants'

4   employed for its high prescribing physicians and their medical staff, pharmacy,

5   hospital and other healthcare customers and Defendants' sales representatives to

6   induce them to prescribe its opioid drugs Nucynta, Nucynta ER, Ultram ER, and

7   Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade,

8   Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica (See Exhibit 40):

9       a.   A photograph Defendants' funded speaker program and birthday cake

10           for Dr. Sammy Saab on or about November 18, 2014 to promote

11           Defendants' opioid drugs Nucynta, Nucynta ER and Ultram and its

12           other drugs;

13      b.   A photograph from a typical Defendants' funded physician's dinner,

14           with sashimi bowl with caviar on or about July 25, 2013 to promote

15           Defendants' opioid drugs Nucynta, Nucynta ER, Ultram, Duragesic,

16           and its other drugs;

17      c.   A photograph of deceased celebrity singer Michael Jackson's former

18           physician Dr. Allan Metzger with two Defendants' sales

19           representatives on or about November 16, 2011 to promote

20           Defendants' opioid drugs Nucynta, Nucynta ER, Ultram, Duragesic,

21           and its other drugs;

22      d.   A photograph of Dr. Ed Kim with alcohol at a Defendants funded Dr.

23           Lawrence Miller speaker program on or about June 10, 2010 to

24           promote Defendants' opioid drugs Nucynta, Nucynta ER, Ultram,

25           Duragesic, and its other drugs;

26      e.   A photograph of one of Defendants' targeted physician and his

27           medical staff with alcohol at the same Defendant's funded Dr.

28                                          -55-

Lawrence Miller's speaker program on or about June 10, 2010 to promote Defendants' opioid drugs Nucynta, Nucynta ER, Ultram, Duragesic, and its other drugs;

f.   A photograph of a doctor with a Xarelto package on or about December 6, 2012 during a Defendants' funded meeting to illegally promote and market Xarelto and its other drugs. More specifically, here, the physician is Dr. Mark Barats is a nephrologist at this Janssen funded meeting where its drug Xarelto was not indicated for kidney compromised patients;

g.   A photograph of Dr. Peter Rosenberg's birthday cake on or about November 17, 2014 to promote Defendants' opioid drugs Nucynta, Nycunta ER, and Ultram, and its other drugs;

h.   A photograph of a birthday party for a nurse at South Bay Gastroenterology group on or about June 25, 2014, to promote Defendants' opioid drugs Nucynta, Nycunta ER, and Ultram, and its other drugs;

i.   A photograph of a birthday party for a nurse at South Bay Gastroenterology Medical Group on or about June 3, 2014, to promote Defendants' drugs Olysio, Simponi, Remicade, and its other drugs;

j.   A photograph of a birthday party for office staff at South Bay Gastroenterology Medical group on or about May 24, 2011 to promote Defendants' drugs Olysio, Simponi, Remicade, and its other drugs;

k.   A photograph of deceased celebrity singer Michael Jackson's former physician Dr. Allan Metzger's assistant's birthday party at his office on or about May 24, 2011 to promote Defendants' opioid drugs Nucynta, Nycunta ER, Ultram, Duragesic, and its other drugs;

Complaint for Damages and Demand for Jury Trial

188.   Defendants knew that its provision of kickbacks to these physicians and researchers was illegal and made efforts to conceal its illegal, fraudulent scheme by funneling some payments through third-party consulting organizations. Defendants also understood that its provision of these kickbacks actually caused its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica to be used for off-label purposes. Many of these drugs were paid for by Medicaid, Medicare, and the TRICARE health care system for military members and their families. Had the United States and the several States known that these drugs were used due to a fraudulent kickback scheme, they would not have provided reimbursement for these drugs.

> *i. Defendants Paid Physicians Honoraria, and Lavish Meals to Attend or Speak at Events Promoting the Use of Opioid Drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs.*

189.   In their efforts to promote the use of its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs in off-label patient populations, Defendants provided honoraria, and lavish meals to key opinion leaders and other physicians to attend or speak at dinners, lunches, conferences, symposia, and other events where Defendants' drugs were being promoted.

190.   The meals directly took into account the volume and value of the business generated and were given to physicians who had used or would agree to use or promote the use of its opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade,

-57-

1   Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica.

2   191.   Many dinner meetings consisted of lavish dinners at local restaurants. The

3   emphasis at some of these meetings was also on off-label uses of its opioid drugs

4   Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio,

5   Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi,

6   Elmiron, and Imbruvica, and other Defendants' drugs, and thousands of dollars'

7   worth of honoraria were paid to physicians who spoke about off-label uses at these

8   meetings. High volume prescribing doctors and local opinion leaders were targeted

9   for invitation. High volume prescribing Medicaid and Medicare doctors were often

10   specifically targeted for invitation. At all of the events physicians were encouraged

11   to increase their use of Defendants' drugs.

12   192.   For example, a February 12, 2015, dinner was held at the expensive

13   Cecconi's restaurant in West Hollywood, California for high prescriber Dr.

14   Edward Mena and for some other physicians who were targeted for sales (See

15   Exhibit 41).

16   193.   Defendants ensured that cash and meals were often targeted specifically at

17   high Medicare and Medicaid prescribing doctors, to increase market share within

18   the Medicaid and Medicare programs, and to influence the market share status of

19   Defendants' drugs within the Medicaid and Medicare programs. In addition, cash

20   and meals were often targeted at high Medicaid and Medicare volume facilities in

21   order to increase Defendants' reimbursements through State and Federal health

22   care systems. Also, formulary committee members at high volume Medicaid

23   facilities were specifically targeted for cash and meals to place Defendants' drugs

24   on their approved drug formularies and hospital protocols, and to purchase

25   Defendants' drugs for their inventories and increase Janssen's reimbursements.

26   194.   Defendants' sales representatives were encouraged to be involved with prior

27   authorization process with Ultram ER, Nucynta, Nucynta ER, Aciphex and

28   -58-

1  Simponi in order to pass insurance, hospital and Medicare drug formularies, and

2  prior authorization manipulation was part of their business plans (See Exhibit 42).

3  Not only does this violate HIPAA, it also violates prohibitions on illegal

4  kickbacks.

5  195.   During 2009 and from 2012-2015, Relator was on Defendants' sales force

6  for selling the drug Remicade. Janssen managers required Relator to induce staff at

7  RxBiotech specialty pharmacy located in the Beverly Sinai Medical Pharmacy

8  with lunches and dinners and other inducements to get them to give access to lists

9  of patient names, and to pull-through Remicade prescriptions, using Janssen-

10  created language to present to insurance payers in order to get Remicade

11  prescriptions approved through prior authorization.

12  196.   Defendants' District Managers touted that the number one sales

13  representative in the country in 2012 got prescriptions by going to physician

14  offices and simply flagging the charts with Ultram ER stickers and doing prior

15  authorizations for each patient. This practice was encouraged by the Regional

16  Business Director and other District Managers. Examples of prior authorization

17  pull through effort requirements for sales staff by District Manager Mo Issa are

18  added as an Exhibit. (See Exhibit 43).

19  197.   Defendants' sales representative involvement in the prior authorization

20  process endangered the patients' HIPAA rights and was designed to bypass the

21  existing formulary process to gain the prescription.

22  198.    Janssen's territory business plans often included tracking of doctors by their

23  volume of Medicare and Medicaid patients, average duration of treatment, and the

24  average revenue from Janssen drugs. Janssen management utilized this Medicaid

25  and Medicare volume information in order to determine which doctors to target for

26  expensive meals and cash payments.

27  199.   For example, a February 27, 2015, Janssen business email updated Olysio

28

-59-

1   sales representatives about various State Medicaid agreements to pay for the drug.

2   Medicaid programs in California and a large number of other states were covering

3   Olysio as of Feb. 25, 2015, and Janssen tracked twenty-three (23) states where

4   Medicaid payment was possible. Janssen sales representatives were sent the

5   information by email, and were told to report on their experience in "pulling

6   through" any of the California Medicaid prescriptions through the California prior

7   authorization process (See Exhibit 44).

8   200.   For example, a 2009 sales planning spreadsheet called for offering paid

9   speaker programs and paid lunches as part of the "Plan of Action" to get Medicare

10  and private insurance reimbursed physicians to write more prescriptions for

11  Nucynta (See Exhibit 45).

12  201.   For example, an August 3, 2014, Janssen business plan document called for

13  offering paid speaker programs and paid lunches as part of a campaign to promote

14  Olysio to Medicare physicians. The document noted that Dr. John Hoefs had 10%

15  Medicare patients; the office of Dr. Tarek Hassanein had 32% Medicaid and 10%

16  Medicare; Dr. Richard Quist had 9% Medicare; Dr. Michael Demicco had 16%

17  Medicare; Dr. Ke-Qin Hu had 67% Medicare; the office of Dr. Alaa Abousaif had

18  6% Medicare; Dr. Syam Gaddam had 13% Medicare; and Dr. Lawrence Hurwitz

19  had 10% Medicare (See Exhibit 42).

20  202.   For example, a June 9, 2013 Janssen sales tracking document for Ultram ER

21  noted that 21% of sales were to Medicare patients, and 4% were to Medicaid fee-

22  for-service patients (See Exhibit 46).

23  203.   Defendants' sales representatives were instructed to coordinate checks for

24  payment for up to $3,000 to speakers for each dinner speaking program, and

25  invitations to lavish meals exclusively to targeted high volume prescribers or

26  referral sources in order to meet the sales representatives' required sales levels for

27  bonus payouts each quarter. Defendants' sales representatives were instructed to

28  -60-

1   target cardiologists, catheterization lab physicians, and internal medicine

2   physicians for prescriptions, and buy them expensive meals, and sign them up for

3   paid speaking engagements.

4   204.   For example, on January 27, 2012, Dr. Gerald Sacks was paid $1,500 to

5   speak at Boa Steakhouse in West Hollywood, California on the topic of

6   management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit

7   47).

8   205.   For example, on February 6, 2012, Dr. Lawrence Miller was paid $1,000 to

9   speak at Sotto Restaurant in Los Angeles, California on the topic of management

10   of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 48).

11   206.   For example, on March 18, 2008, Dr. Ellie Goldstein was paid $1,500 to

12   speak at Valentino's Restaurant in Los Angeles, California on the topic of

13   community-acquired pneumonia to promote the Janssen antibiotic Levaquin (See

14   Exhibit 49).

15   207.   For example, on May 9, 2012, Dr. Jonathan Nissanoff was paid $2,500 to

16   speak at La Seine Restaurant in Beverly Hills, California on the topic of

17   management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit

18   50).

19   208.   For example, on March 7, 2012, Dr. William French was paid $2,000 to

20   speak at Fig and Olive Restaurant in Los Angeles, California on the topic of stroke

21   and systemic embolism to promote the Janssen blood thinner Xarelto (See Exhibit

22   51).

23   209.   For example, on June 27, 2012, Dr. Matthew Budoff was paid $2,000 to

24   speak at Tanino Restaurant in Los Angeles, California on the topic of stroke and

25   systemic embolism to promote the Janssen blood thinner Xarelto (See Exhibit 52).

26   210.   For example, on December 8, 2011, Dr. Lawrence Miller was paid $1,000 to

27   speak at Boa Steakhouse in West Hollywood, California on the topic of

28

-61-

management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 53).

211.   For example, on September 18, 2008, Dr. Allan Metzger was paid $1,000 to speak at Geisha House in Los Angeles, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 54).

212.   For example, on October 21, 2008, Dr. Gerald Sacks was paid $1,500 to speak at Katana Restaurant in West Hollywood, California on the topic of "New Directions in Pain" to promote the Janssen opioid Nucynta (See Exhibit 55).

213.   For example, on April 18, 2012, Dr. Lawrence Miller was paid $1,000 to speak at IL Covo Restaurant in Los Angeles, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 56).

214.   For example, on December 8, 2011, Dr. Lawrence Miller was paid $1,000 to speak at Wolfgang's Steakhouse in Beverly Hills, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 57).

215.   Payment for dinner and other incentives to increase referrals to a physician for the use of opioid drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs is inappropriate and illegal. According to the federal Health and Human Services Office of the Inspector General (HHS OIG), paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business. See, e.g., 68 F.R. 23738. ("these arrangements [entertainment, recreation, travel, meals, etc.] potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business.")

-62-

*ii. Defendants Concealed Some Illegal and Fraudulent Payments to Physicians by Funneling Them through Third Party Consultant Companies.*

216.   In order to hide illegal payments to physicians, Defendants made many payments to doctors through the MedForce marketing company, among other similar vendors. MedForce arranged for expensive meals and sent payments to sales representatives to be given to speakers for promoting Defendants' drugs off-label.

217.   For example, Janssen contracted with MedForce to pay a speaker fee and set up invitations and dinner reservations for Dr. Edward Mena to speak at Cecconi's restaurant in West Hollywood, California on February 12, 2015 on Olysio. MedForce provided sign-in sheets for guests, reviewed unauthorized charges on the food and beverage bill, collected meeting evaluations, and provided a credit card authorization for expenses (See Exhibit 58).

*iii. Defendants Knew Their Payments to Physicians Were Illegal Because They Were Intended for the Purposeful Inducement of Business.*

218.   Defendants knew their payments to physicians were illegal kickbacks. In fact, Defendants provided personnel with guidelines that indicated that field employees could occasionally provide modest meals or snacks to health care professionals where the primary purpose is an informational presentation (See Exhibit 59). In contrast, Defendants' dinner events with paid speakers were often a sham, with the speaker getting paid up to $3,000 per speaking event, but having no real responsibility. Doctors received prepared slides from Defendants to speak from, so that the doctors did not have to put forth any effort to prepare a presentation, but gave the impression to attendees that the slides reflected their own opinions and conclusions. Doctors sometimes simply opened a laptop on the

-63-

1  table at dinner with some slides on it, and then only spoke for five to ten minutes,
2  or did not speak at all and simply enjoyed the lavish dinner with the other
3  attendees.

4            *iv. Defendants' Payment of Illegal Kickbacks to Physicians Actually*
5            *Affected the Use of Opioid Drugs Nucynta, Nucynta ER, Ultram ER,*
6            *and Duragesic, along with Olysio, Xarelto, Aciphex, Levaquin,*
7            *Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and*
8            *Imbruvica, and other Defendants' Drugs among Doctors*

9  219.   Defendants' scheme to pay physicians resulted in specific sales. Defendants,
10  like most branded drug companies, monitor the relationship of its sales to its
11  promotional efforts over a very short timeframe; Defendants would be concerned
12  about a drop in sales within a certain therapeutic regime not after a year look-back,
13  or even a quarterly look-back, but over a period of just weeks.

14  220.   Defendants' marketing and sales strategy documents show that at least on a
15  weekly basis Defendants were tracking prescription volume by doctor, and
16  tracking the percentage change in prescribing habits of physicians for Defendants'
17  drugs. In addition, Defendants tracked the return on investment ("ROI") of paid
18  travel and expensive meals for physicians. Defendants' sales representatives were
19  instructed to ask physicians for additional prescriptions when the physicians were
20  paid to speak at a lavish meal event, and told to track follow-up prescriptions by
21  the physician, and to hold the physicians accountable if the physicians did not
22  increase prescriptions of Defendants' drugs.

23  221.   Physicians were made aware by sales representatives that the physicians
24  would not continue to be invited to lavish meals if the physicians did not remain in
25  the high volume prescriber range, and if the physicians did not prescribe
26  Defendants' drugs. Physicians who did not continue to prescribe Defendants' drugs
27  were tracked on a quarterly basis by Defendants' marketing and sales personnel,

28

-64-

1    and were sometimes penalized by being taken off target lists for invitations to

2    future lavish meals and offers of speaking engagements, paid research

3    opportunities, and other perks. Defendants' pushed "prescribe to play," quid pro

4    quo-focused sales strategies, which are based entirely on the amount of

5    prescriptions written by the physicians and the ability of the physician to influence

6    other physicians to begin prescribing Defendants' drugs. The recipients of these

7    awards and benefits were selected by Defendants' marketers based on the

8    recipients' ability to prescribe its opioid drugs Nucynta, Nucynta ER, Ultram ER,

9    and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade,

10   Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other

11   Defendants' drugs and to influence other doctors to do so.

12   222.   Defendants' sales representatives provided meals and other favors for

13   physician members of formulary committees and of hospital guideline committees

14   and their staffs, including committees which affected large Medicaid and Medicare

15   patient populations, such as hospitals with large Medicaid and Medicare

16   populations. Defendants' management directed sales staff to invite formulary

17   committee members and guideline committee members to lavish meals and offer

18   paid speaking opportunities, paid research, and other perks. Defendants'

19   management arranged inducements for influential formulary and guideline

20   committee members in order to put its opioid drugs Nucynta, Nucynta ER, Ultram

21   ER, and Duragesic, and its other drugs Olysio, Xarelto, Aciphex, Levaquin,

22   Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, or

23   other Defendants' drugs on their formulary or guidelines or standing orders, or to

24   purchase Janssen drugs into inventory.

25   223.   Defendants also instructed physicians' office staff and clinic personnel to

26   maximize Medicaid and Medicare billing. Defendants' field sales representatives

27   gave billing seminars, and paid billing maximization speakers to give

28

-65-

Complaint for Damages and Demand for
Jury Trial

1 | presentations, in which the Defendants' sales representatives suggested how to bill
2 | Medicare in order to receive maximum revenues. The field sales representatives
3 | also reviewed prior billings for some facilities, and suggested additional billings
4 | that Medicaid or Medicare were known to pay for without question (See Exhibit
5 | 60).

6 | 224.   Defendants also instructed its sales representatives to review patient records
7 | at doctor's offices and to help them select high risk patients to receive opioid drugs
8 | Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs Olysio,
9 | Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi,
10 | Elmiron, and Imbruvica, and other Defendants' drugs instead of competitor drugs.

11 | 225.   For example, in 2014, the Janssen Specialty Hepatology and Immunology
12 | ("JSHI") organization was brought together by Defendants for one purpose and
13 | one purpose only: to exploit the short off-label niche in which the Olysio product
14 | could be effectively marketed. To the tune of $2.5 billion dollars in revenue ($600
15 | average price per pill) and the expense of Medicaid, Medicare, TriCare, and private
16 | insurance companies this strategy was extremely successful. Soon after this off-
17 | label opportunity closed, the company disbanded the JSHI franchise, as the
18 | commercial opportunity for on-label sales of Olysio was considered minimal.

19 | 226.   The evidence points to willful and premeditated schemes of off-label
20 | promotion, kickbacks, and violations of patients' HIPAA protections. The Relator,
21 | who was vocal about these tactics, was prevented from promotions and from
22 | applying to other sales opportunities within the company, and was many times
23 | verbally and publicly reprimanded for not toeing the company line, and generally
24 | not being "positive."

25 | 227.   The company was so aggressive about exploiting this Olysio off-label
26 | opportunity that many times the reps were worked one hundred (100) hours per
27 | week just to meet the extensive demands. Often times sales representatives were

28 |

Complaint for Damages and Demand for
Jury Trial

1   required to work nights and weekends and to take very minimal vacations to meet

2   the increased demand of this short window of Olysio's off-label sales

3   "opportunity."

4   228.   For example, in December 2014, Janssen Regional Business Director

5   requested Defendants' sales representatives to participate in non-educational

6   events such as a liver foundation "Healthy Flavors of Coronado Culinary Gala" in

7   San Diego's prestigious Coronado Hotel, where high prescribing physicians were

8   presented with an honorary plaque and award and Janssen paid $4,000 to

9   participate as a "Table Sponsor." The Coronado Hotel event violated company

10   policy since it was only for the entertainment of Janssen's physician customers,

11   and had no educational component. The decision to fund the event was based on

12   Janssen Regional Business Director Mo Issa wanting to support a local San Diego

13   customer, high-Olysio prescriber Dr. Tarek Hassanein, and the purpose was a quid

14   pro quo arrangement with him for more prescribing (See Exhibits 61, 62).

15   **C.   <u>Defendants Illegally Promoted Use of Opioid Drugs Nucynta, Nucynta</u>**

16   **<u>ER, Ultram ER, and Duragesic, along with Olysio, Xarelto, Aciphex,</u>**

17   **<u>Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,</u>**

18   **<u>and Imbruvica, and other Drugs by Illegally Promoting a Spread</u>**

19   **<u>between Published Pricing and the Prices Offered to Customers</u>.**

20   229.   Defendants defrauded the Medicaid program by reporting excessively high

21   and false prices for some of their prescription drugs with knowledge that Medicaid

22   used these reported prices for establishing reimbursement to its Medicaid providers

23   for these drugs. As a result, Medicaid sustained significant losses to its program by

24   making reimbursement payments to Defendants' Customers/Medicaid providers

25   for the drugs at illegally excessive prices compared to the prices at which the

26   Defendants' Customers/Medicaid providers actually acquired the same drugs. This

27   is a practice known in the industry as "creating a Spread." The Spread is utilized

28

-67-

Complaint for Damages and Demand for
Jury Trial

1   by pharmaceutical companies to seize market share and thereby to fraudulently

2   increase their profits.

3   230.   Via this scheme, commencing sometime by at least 2005 and continuing

4   through the present, Defendants defrauded States and the United States by

5   knowingly causing the Medicaid Programs to pay false or fraudulent claims.

6   Examples of the Defendants' specific drug products at issue include its opioid

7   drugs Nucynta, Nucynta ER, Ultram ER, and Duragesic, and its other drugs

8   Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana,

9   Simponi, Elmiron, and Imbruvica, and are identified by "NDC" numbers in

10  Relator's extensive documentary evidence. The drugs at issue are referred to

11  jointly as the "Spread Drugs."

12  231.   The Defendants marketed and sold their Spread Drugs to their Customers.

13  The Customers purchased the Spread Drug products either directly from

14  Defendants, through a GPO contract, or through wholesalers or specialty

15  distributors. When Defendants sold their Spread Drugs to wholesalers, they

16  invoiced wholesalers at gross prices which Defendants referred to as wholesale

17  acquisition cost prices, however Defendants reported misleading, inflated AWPs

18  and, in some cases, WACs to the pricing compendia for the Spread Drugs which

19  had no relation to the prices Defendants knew were generally and currently

20  available in the marketplace.

21  232.   The amount paid by a Customer was typically based on a price negotiated

22  with Defendants, a price negotiated with a GPO, or an often equally competitive

23  price set by a specialty wholesaler or distributor. Defendants offered "contract

24  pricing" to many of their Customers that was less than "Non-Contract" or "Regular

25  Cost" prices generally offered by wholesalers and distributors to any customer.

26  Defendants created inflated Spreads on the Spread Drugs for Customers that

27  purchased the Spread Drugs at regular cost, available to virtually any industry

28  -68-

1    customer, and an even greater Spread for those purchasing the Spread Drugs

2    "under contract".

3    233.    Regardless of the method of purchase, Defendants' Customers submitted

4    claims for payment to Medicaid when a drug product was dispensed to a program

5    beneficiary. The claims submitted by Defendants' Customers were paid at amounts

6    directly influenced by Defendants' false and fraudulent prices. Defendants

7    disseminated false pricing information for their drug products to the Pricing

8    Publications. Defendants knew the prices they reported to the pricing compendia

9    controlled the pricing compendia's published reports of AWP and WAC.

10   234.    The manufacturers control the prices that are reported by the compendia,

11   including First DataBank (FDB) a Division of the Hearst Corporation. Some state

12   Medicaid programs use FDB. For example, FDB asserts that all pricing

13   information is supplied and verified only by the products' manufacturers, and that

14   there is no independent review of those prices for accuracy.

15   235.    Accordingly, the manufacturers functionally control what price information

16   that payors, including the Medicaid program, can obtain. Defendants have taken

17   undue advantage of the resulting disparity in status, power and knowledge by

18   knowingly reporting prices for Medicaid reimbursement purposes that bear no

19   relationship whatsoever to prices generally or currently available in the

20   marketplace. The Defendants knew that the state Medicaid programs, which

21   employ small numbers of pharmacy staff, would not have the manufacturers'

22   insider knowledge, resources, or opportunity necessary to discover and remedy the

23   Defendants' drug pricing fraud.

24   236.    Defendants first reported false prices for the Spread Drugs sometime by at

25   least 2005. The reported prices did not represent prices actually being charged in

26   the marketplace. Thereafter, Defendants' employees typically reported and/or

27   confirmed the false and fraudulent prices to the Pricing Publications periodically.

28

Complaint for Damages and Demand for
Jury Trial

1  During the relevant time period, Defendants generally reported falsely inflated
2  AWPs and WACs on the Spread Drugs while simultaneously offering dramatically
3  lower prices to their Customers in the marketplace. Defendants routinely failed to
4  update, adjust, decrease or correct their initial price reports for the Spread Drugs to
5  reflect prices being charged in the marketplace. Consequently, Defendants caused
6  the price reporting compendia to publish false inflated WACs and/or AWPs from
7  sometime by at least 2005 and continuing through the present.

8  237.   Defendants knew that the prices they reported to the Price Publications
9  directly affected reimbursement amounts paid by the Medicaid Programs. The false
10 prices Defendants reported to the Pricing Publications caused inflated government
11 reimbursement amounts to be paid on claims submitted by Defendants' payors for
12 the drug products at issue. Additionally, Defendants knew that withholding reports
13 of WAC to the pricing compendia during the relevant time period would ensure the
14 pricing compendia's failure to report WAC. Relator's extensive documentary
15 evidence includes a pricing chart illustrating multiple examples of the NDCs at
16 issue showing: reported prices (AWP and, if applicable, WAC), the Relator's Cost
17 and the corresponding Spreads (difference between the prices at which Defendants
18 actually sold their Spread Drugs and the false prices reported by Defendants). The
19 prices listed as those available to the Relator, as an independent pharmacy, are
20 some of the highest prices offered by Defendants in the marketplace. Therefore,
21 the inflated Spreads available to the Relator were some of the lowest Spreads in the
22 marketplace.

23 238.   Defendants manipulated AWPs and WACs to induce their Customers to
24 purchase Defendants' Spread Drugs by marketing to their Customers the huge
25 profits that would result to them from excessive reimbursement payments.
26 Defendants actively used the inflated Spreads and huge profits as a marketing tool
27 directed at providers to promote increased sales of the Spread Drugs. Moreover,

28

-70-

the Spreads, in effect, marketed themselves. Any purchaser could easily calculate the potential profit by using the reported prices and the actual sales price. For example, the inflated Spreads were readily apparent from information on the drug purchasing software programs available to Customers from drug wholesalers.

239.   The Defendants reported or caused to be reported false or misleading prices to Medicaid by providing false or misleading price information including but not necessarily limited to AWP, Suggested Wholesale Price ("SWP"), CDP, WAC, DP, List Price and direct wholesale price to the compendia with knowledge that they in turn would utilize such false and misleading price information in determining the AWPs and DPs that were reported to Medicaid.

240.   For example, Defendants published AWPs that were many times greatly in excess of 30% above acquisition price for the drugs, creating a large spread that was promoted to customers as a way of illegally profiting off of Medicaid (Exhibit 63):

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|-----------|-----------|-----|-----|-----------------|--------------|--------------|
| 2/7/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $145.42 | $3.92 | $141.50 | 3609.69% |
| 3/8/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $219.12 | $5.91 | $213.21 | 3607.61% |
| 5/21/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $273.90 | $7.39 | $266.51 | 3606.35% |

-71-

Complaint for Damages and Demand for
Jury Trial

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 10/25/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $109.56 | $2.96 | $106.60 | 3601.35 14% |
| 5/12/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $136.95 | $4.43 | $132.52 | 2991.42 21% |
| 2/5/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $242.36 | $7.84 | $234.52 | 2991.32 65% |
| 6/21/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $242.36 | $7.84 | $234.52 | 2991.32 65% |
| 9/7/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $242.36 | $7.84 | $234.52 | 2991.32 65% |
| 11/2/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $60.59 | $1.96 | $58.63 | 2991.32 65% |
| 1/31/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $60.59 | $1.96 | $58.63 | 2991.32 65% |
| 2/28/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $363.54 | $11.76 | $351.78 | 2991.32 65% |

Complaint for Damages and Demand for Jury Trial

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 3/5/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $363.54 | $11.76 | $351.78 | 2991.32 65% |
| 8/27/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $302.95 | $9.80 | $293.15 | 2991.32 65% |
| 2/8/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $182.60 | $5.91 | $176.69 | 2989.67 85% |
| 3/1/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $182.60 | $5.91 | $176.69 | 2989.67 85% |
| 1/15/2011 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $182.60 | $5.91 | $176.69 | 2989.67 85% |
| 9/27/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $273.90 | $8.87 | $265.03 | 2987.93 69% |
| 10/1/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $273.90 | $8.87 | $265.03 | 2987.93 69% |
| 10/11/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $273.90 | $8.87 | $265.03 | 2987.93 69% |

-73-

| Fill Date | Drug Name | NDC | AWP | Acquisit ion Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 10/14/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $45.65 | $1.48 | $44.17 | 2984.45 95% |
| 1/25/2011 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.45 95% |
| 2/25/2011 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.45 95% |
| 2/28/2011 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.45 95% |
| 3/7/2011 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.45 95% |
| 3/15/2011 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.45 95% |
| 6/13/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $174.48 | $5.88 | $168.60 | 2867.34 69% |
| 11/23/2010 | LEVAQUIN /D5W 500/100 INJ | 50458-0168-01 | $482.02 | $75.37 | $406.65 | 539.538 3% |

-74-

Complaint for Damages and Demand for Jury Trial

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 11/26/2010 | LEVAQUIN /D5W 500/100 INJ | 50458-0168-01 | $482.02 | $75.37 | $406.65 | 539.5383% |
| 11/29/2010 | LEVAQUIN /D5W 500/100 INJ | 50458-0168-01 | $482.02 | $75.37 | $406.65 | 539.5383% |

241.   Defendants were well aware of how Medicaid used Defendants' reported pricing information to set reimbursement levels to providers for the Spread Drugs. At all relevant times, Defendants were aware that Medicaid used published AWPs and/or WACs to estimate acquisition costs, defined as the best estimate of the price generally and currently paid by providers in the marketplace.

242.   Defendants were also aware that the extraordinarily high volume of prescriptions processed by Medicaid requires the type of electronic data interchange that the Defendants have taken advantage of in order to defraud the Medicaid program. For example, from 2003 through 2011 Medicaid paid for an average of 35.8 million prescriptions per week nationwide. During this time, Medicaid processed prescriptions for over 35,000 NDC drug codes each year, reaching a peak of 39,212 NDC drug codes in 2011.

243.   Defendants pay the Medicaid rebates and have reports that indicate the amount of their Spread Drugs, and the number of prescriptions for their Spread Drugs paid for by State by quarter. Defendants know that the Medicaid States are processing so many claims that it cannot be handled manually. Defendants know that Medicaid used complicated electronic payment databanks, and Defendants provided the databanks with false information.

-75-

Complaint for Damages and Demand for Jury Trial

244.   After creating price Spreads for their Spread Drugs, Defendants enlarged those Spreads by reducing acquisition costs to providers without disclosing the reductions to compendia such as First DataBank or to the Medicaid Program. Defendants also gave Customers incentives that decreased the price of prescription drugs, such as discounts, rebates, off-invoice pricing, free goods, charge backs, volume discounts, credit memos, "consulting" fees, debt forgiveness, educational and promotional grants, and other financial incentives. Price reductions were granted to some retail pharmacy chains, wholesalers, buying groups, pharmacy benefit managers at the request of those chains, wholesalers, buying groups or pharmacy benefit managers. These price reductions financially benefitted providers, but were not reflected in the AWPs and other price quotes the Defendants reported to the compendia, which formed the basis for reimbursements by Medicaid.

## DEFENDANT'S ACTS OF RETALIATION

245.   In early 2013, Relator was a celebrated company employee who had won numerous sales awards from Defendants such as the "President's Circle" for highest national sales. Relator celebrated with Defendants' employees on stage with sales managers Russ Stough (Regional Business Director, Southern California), Karen Martin, Molly Laughlin, Danielle Felter (District Manager, Southern California), and Jason Hammond (District Manager, Southern California) (please see photograph attached as Exhibit 64).

246.   In or about November 2013, Relator became aware that there were company-wide problems with off-label promotion and kickbacks.

247.   The manner in which Defendants market the use of their drugs is governed by the Food, Drug and Cosmetic Act ("FDCA") (Title 21, U.S.C. § 355) and

Complaint for Damages and Demand for
Jury Trial

1    inducements to physicians are covered by the Medicare and Medicaid anti-

2    kickback laws, 42 U.S.C. 1320a-7b(b), *et seq.*

3    248.    In order to comply with the relevant laws and regulations, pharmaceutical

4    companies like Janssen must be able to account for all off-label marketing

5    materials and inducements given to physicians. In or about November 2013,

6    Relator found out that there were company-wide irregularities with respect to

7    tracking these payments and marketing materials. In particular, Relator spoke up at

8    the Newport meeting in December, 2014 with other Janssen sales representatives,

9    saying that with respect to the specialist pharmacies, that there was a question of

10   how was it legal for the company to work with the specialist pharmacies at such an

11   intimate level on prior authorization pull-through in order to forward the off-label

12   Olysio marketing scheme. At that time the Regional Director Mohammed Issa said,

13   in front of the other sales representatives, that "this was the biggest bunch of BS

14   that I've ever heard," and then castigated Relator on multiple occasions for "not

15   being positive." and "not being a team player," and not "being flexible."

16   Subsequently, the Regional Director warned Relator not to make the same

17   statements again.

18   249.    Thereafter, Relator complained and reported to Janssen human resources and

19   management, both orally and in writing, of these alleged illegal business practices,

20   which violated the FDCA and Medicare and Medicaid anti-kickback laws and

21   other relevant statutes and regulations.

22   250.    In retaliation for these actions, Relator's supervisor at Janssen and Janssen

23   HR personnel began a campaign to harass and intimidate Relator. In particular, the

24   Regional Director would tell Relator that "you are not a team player," and that

25   "you should not point this stuff out in front of the team." This in spite of the fact

26   that in addition to driving five (5) to six (6) hours per day in Relator's own

27   territory to manage the Los Angeles territory, which was the eleventh (11th) highest

28                                        -77-

1   volume territory in the nation, and managing a district including five (5) Western

2   States, Relator was accused of "not being flexible or a team player." During this

3   time period, the relator worked in excess of one hundred (100) hours a week, and

4   consequently started to suffer many job-related physical and health complications

5   [with long-term consequences], and did not do so for other sales representatives in

6   Relator's region. Under company policy, and in Relator's experience, no other

7   sales rep was terminated without a performance improvement plan ("PIP"), unlike

8   the Relator.

9   251.   In or about November 2013, Janssen made it clear to its sales representatives

10   that they were to begin to market Olysio for use off-label to treat HIV and renal

11   failure patients, and other uses that are not approved by the FDA. In November

12   2013, the FDA sent Janssen an approval letter for Olysio's labeling. More

13   specifically, this FDA letter did not allow the Defendants to market Olysio for use

14   in HIV and renal failure patients. However, Janssen continued to market Olysio for

15   use in HIV and renal failure patients, as set forth above.

16   252.   In or about November, 2013, Relator complained about Janssen's off-label

17   marketing strategy to Relator's manager. Relator also voiced concern about

18   Janssen's use of kickbacks. For example, when District Manager Alan Williams

19   wrote about Dr. Sammy Saab getting paid for speaking on Olysio even though it

20   wasn't his "go-to drug" and asked Regional Business Director ("RBD") Mo Issa to

21   intervene on this issue. The RBD asked in turn for the representative to confront

22   the physician and ask "why with so many resources [speaker programs and

23   advisory board kickbacks] does Dr. Saab write such minimal number of patients on

24   Olysio?" The RBD proceeded to state that the Defendants would not be using

25   physicians that are not advocates of the products. And the RBD requested a

26   favorability matrix to be developed to measure ROI of retaining physicians as

27   speakers for products and their perceived value to the company. In this way, the

28

-78-

Complaint for Damages and Demand for
Jury Trial

1   RBD was clearly requiring sales representatives to make certain that their speaker

2   arrangements with physicians were quid pro quo arrangements (See Exhibit 65).

3   253.   Dr. Sammy Saab spoke at multiple dinners on Olysio during 2014-15.

4   Doctors arrived, signed-in, and got seated right away because they did not like to

5   come early. Dr. Saab would arrive early. As part of the scheme, the laptop and

6   projector were already set up by the restaurant staff, and Dr. Saab brought a flash

7   drive with his presentation slides. The average size of a dinner meeting was 12-22

8   people. Dr. Saab greeted the other doctors as they began to arrive. Dr. Saab nearly

9   always spoke to people that he worked with at the UCLA transplant program, and

10   he arranged with members of the audience prior to arriving at the dinner to ask

11   questions about the COSMOS study. Janssen personnel advisedDr. Saab in

12   advance of each dinner that he would not be able to talk off-label about using an

13   Olysio dual-therapy regimen like in the COSMOS study without a question from

14   the audience. Dr. Saab would arrange for a friend in the audience to ask him the

15   off-label question. Sometimes an attendee would forget to ask the off-label

16   question in the audience, so Dr. Saab would say, "did someone have a question

17   about the COSMOS study?", or the Janssen sales representative would step

18   forward and ask the off-label question, since that was the most important part of

19   the talk.

20   254.   Again, in retaliation for these complaints, Relator was subjected to further

21   harassment and intimidation. Relator continued to be treated differently from other

22   sales representatives in the region. Relator had long been a graduate of the

23   management development program. Despite having elevated into the last stage of

24   the program, the management had asked Relator to repeat a series of classes that

25   were already completed. Despite the fact that Relator attempted to apply for

26   another position as the most qualified candidate, citing that Relator had ethical

27   issues selling the product, the management team intervened and reached the hiring

28

-79-

1   manager and told the hiring manager that Relator was job hopping. Relator had

2   been with the same company for nine (9) years at that point, and was not "job

3   hopping." The same manager supported another member of the team that had none

4   of the qualifications to be successful in the new role.

5   255.   For example, other sales representatives in Relator's region were allowed to

6   take vacations or miss meetings in order to accommodate family obligations or to

7   run businesses on the side. Relator was pressured not to take vacation, and to keep

8   working over one hundred hours a week, while noted previously, running the

9   eleventh highest volume territory in the country while managing five other states.

10   Shortly after complaining about Janssen's off-label promotions, Relator was

11   routinely required to attend promotional dinners with doctors, while colleagues in

12   the region were given the night off in order to plan activities with their families or

13   their own side businesses. In fact, the Regional Director himself had a side

14   business that he was spending time on while at the same time demanding a very

15   high amount of work hours from Relator. Relator was asked to work all the local

16   area drug expositions (over 14 additional days with no over time or respite).

17   Despite the intense emotional and social pressure, Relator worked nights for

18   dinners and for completing district management duties, and worked days for sales

19   calls and territory management. Relator was never compensated for these

20   additional hours despite CA regulations.

21   256.   In addition, Relator was subjected to racial and religious discrimination by

22   Relator's manager. For example, on June 26, 2014 while in a meeting in Denver,

23   Colorado, Relator's manager Tyana Grant had her birthday celebrated at a meeting.

24   Ms. Grant had just come back from a church-related trip from Israel. Relator asked

25   her how her trip was, and Ms. Grant said Israel was beautiful, but the Palestinians

26   are like animals. Relator was shocked and asked her what she meant by that. Ms.

27   Grant said that the Muslim kids surrounded her bus and were begging for money.

28

-80-

Ms. Grant said that they weren't acting like humans, they were surrounding the bus like animals, and shaking people down for money. Relator's own family's religious background and ethnic heritage were viciously attacked in this manner, and as a result Relator suffered extreme emotional and physical distress.

257.   In April, 2015, Relator won a sales award for being the District Representative of the Year, because Relator not only ran a sales territory successfully, but Relator also ran an entire five state district and brought that district to the number one position in sales. But even then, Relator was being retaliated against by not being allowed by Defendant to be promoted to the next level of employment as a permanent District Manager. Despite the success Relator experienced in the field and in the district the RBD stated that Relator is not flexible and does not appear to have a positive disposition and such a role would be highly at risk.

258.   On or about August 10, 2015, Defendants' employee Carrie Palmer from Janssen's HR Office illegally disclosed the details of Relator's disability and medical treatment to an outside party in violation of Relator's rights under HIPAA.

259.   On August 11, 2015, an HR representative for Janssen terminated Relator by mail, without paying Relator's accrued vacation time as per California law. Relator was not given a severance package, as the other sales representatives who had been laid off previously had been. There was no PIP (Performance Improvement Plan) to warn Relator and ask for corrective action.

260.   Janssen's stated reason for terminating Relator was for Relator's making of additional ("side") income. However, most of the Defendants' sales representatives and managers followed the same customary practice as Relator in creating a side income. This conduct had occurred for many years in front of Defendant's managers without any other sales reps receiving any criticism or complaints. For example, the Regional Business Director Mo Issa was simultaneously the CEO of

Complaint for Damages and Demand for
Jury Trial

1  another company, Noor Vitamins. This was information that was highly public and
2  understood as completely compliant as the RBD discussed going to Dubai for this
3  business and talked about his multiple business successes.

4  261.   After the Relator reported the alleged fraud to Defendants' management, and
5  despite Relator's long history of employment and the fact that the Relator was an
6  exemplary employee, having won multiple sales awards nationally and regionally,
7  the Relator was discharged without notice. The discharge included Defendants'
8  employee Carrie Palmer from Defendants' human resources department contacting
9  an outside organization and illegally violating Relator's rights under Health
10  Insurance Portability and Accountability Act of 1996 ("HIPAA"). Here,
11  Defendants revealed the details of Relator's personal and private medical records,
12  and temporary disability, without Relator's knowledge and consent. Subsequently,
13  the Relator was discharged from that new employer without cause.

14  262.   Furthermore, on or about August 10th, 2015, Defendants' human resources
15  department employee Carrie Palmer contacted Relators' new employer and
16  disclosed details of Relator's health issues to this new employer. Multiple
17  employees from the new employer including but not limited to employee A and
18  employee B informed the Relator of Defendant's egregious conduct. Relator was
19  subsequently terminated by the new employer on or about August 18th, 2015, only
20  days after the Defendants contacted.

21  263.   Relator alleges other infractions including but not limited to
22  violating HIPPA and encroachment on Relator's privacy, COBRA violations, and
23  interference with the active medical treatment of an employee under distress and
24  during a period of active disability. Defendants retaliated against Relator by
25  terminating Relator's medical insurance, terminating Relator's disability insurance,
26  interfering with Relator's rights to continue insurance under Cobra, and by
27  refusing to pay for treatments for Relator's severe disabling condition which was

28

-82-

Complaint for Damages and Demand for
Jury Trial

1  brought about by Defendants' hostile work environment described herein.

2  264.   For example, despite medical evidence of Relator's inability to drive an

3  automobile, Defendants refused to make accommodation for the

4  Relator.  Defendants' referring physician Dr. Orfus stated in Relator's Qualified

5  Medical Examiner ("QME") report that if Relator was unable to drive an

6  automobile, then Relator was unable to work. While Relator was qualified for

7  Long Term disability based on the QME and Relator's employee contract with

8  Defendants, and the long-term disability insurance that Relator personally paid for,

9  Defendants proceeded to rescind relator's disability claim.  Relator contacted the

10  claims administrator Regina Carter for Prudential that is the long-term Disability

11  Plans administrator.  Prudential's Regina Carter stated that Relator's claim was

12  being processed for payment and intact there was a case number

13  assigned.  According to the claims administrator Regina Carter, the Defendants

14  interference with an application at this stage was extremely uncommon, and

15  Defendants requested Prudential to terminate the application in violation of state

16  law.

17  265.   Defendants further blacklisted the Relator from gainful employment. Relator

18  is informed of verbal communications from August 2015 through June, 2016,

19  where several of the Defendants employees in human resources and executive

20  management, such as Regional Business Director Mo Issa, Helen Hutchins, Jason

21  Hammon, were overheard making false statements about the Relator. This includes

22  Defendants' sales representatives including Ron Lloyd and Julie Ewers, and several

23  managers, including Sunny Lee and Jennifer Brown.   This conduct black-listed the

24  Relator and made Relator unemployable. And, to further undermine Relator's

25  credibility, Defendants' employees retaliated and maliciously accused the relator

26  of fraud. Defendants roguishly continued these malicious attacks through June

27  2016, almost one year after Relator's termination, and Defendants failed to curtail

28

-83-

Complaint for Damages and Demand for
Jury Trial

1   these highly defamatory communications.

2   266.   Another tactic that Defendants employed to further intimidate and harass the

3   Relator was the interference with Relator's disability application.

4   Consequently, Relator suffered a multitude of injuries such as physical and

5   debilitating illnesses and was still under treatment at the time of discharge.

6   267.   Relator was a stellar, nationally-ranked sales representative of Defendants,

7   illustrated by Relator's record, multiple awards and written and verbal management

8   accolades.  As a result of working over one hundred hours a week, verbal abuse

9   and a hostile work environment, Defendants terminated Relator under extreme

10  medical duress. At the time of termination, the Relator needed to see multiple

11  specialists to treat chronic refractory hemiplegic migraines, and Relator was placed

12  on a heavy daily prescription regimen to control excruciating pain, nausea and

13  disorientation.  Relator was barely able to drive an automobile, keep food down,

14  and had to take multiple medications and see multiple specialists to for basic

15  activities such as walking and talking.  Relator's health continued to decline and

16  deteriorate further caused by Defenadnts' hostile and illegal work environment

17  which was further aggravated by Defendants' retaliation, illegal termination,

18  violation of HIPPA, and defamation of Relator.

19  268.   For example, prior to Relator's period of total disability, Relator's territory

20  produced nearly $100 million in Olysio sales, yet relator was publicly reprimanded

21  for not producing more Simponi prescriptions and other prescription manufactured

22  and distributed by the Defendants. When Relator, an interim District Manager,

23  brought the Defendants' team performance to the number one sales position in the

24  United States of America, instead of encouragement, gratitude and positive

25  reinforcement, relator was told that the success was just a result of natural market

26  forces.  When Relator contended several illegally business practices to the

27  Defendants, Relator was singled out as not being "positive" and not having "team

28

-84-

Complaint for Damages and Demand for
Jury Trial

1  spirit" by the Defendants.  Consequently, Relator was reprimanded both publicly

2  and privately, and was denied company benefits such as vacation and other

3  compensation.

4  269.   Defendants continued to intimidate Relator by interfering with Relator's

5  right to privacy, ability to receive adequate medical care, resolve disability, and

6  interfering with the Relator's ability to maintain gainful employment and preserve

7  a 10-year career in pharmaceutical sales. The Defendants' actions continued

8  unabated and given the fact that the Defendant has been under a Corporate

9  Integrity Agreement for two separate counts of fraud and off-label promotion,

10  270.   As a direct and proximate result of Defendants' unlawful actions as detailed

11  herein, Relator has suffered loss of employment opportunities, lost a potential

12  career, loss of dignity, suffered great humiliation, and emotional injuries

13  manifesting physical illness and severe emotional distress.

14  271.   As a result of the conduct by Defendants of which Relator complains,

15  Plaintiff suffered and continues to suffer substantial losses in earnings and other

16  employee benefits.  Relator will seek leave to amend this Complaint to state the

17  amount or will proceed according to proof at trial.

18  272.   Relator suffered emotional distress as a result of the conduct by Defendants

19  of which Relator complains.

20  273.   At all material times, Defendants, and each of them, knew that Relator

21  depended on Relator's wages and other employee benefits as a source of earned

22  income.  At all material times, Defendants were in a position of power over

23  Relator, with the potential to abuse that power.

24  274.   Relator was in a vulnerable position because of Relator's status as a

25  whistleblower, with a relative lack of power, because Relator had placed Relator's

26  trust in Defendants, because Relator depended on Relator's employment for

27  Relator's self-esteem and sense of belonging, because Relator relied upon

28  

Complaint for Damages and Demand for
Jury Trial

Relator's employment as a source of income. Defendants were aware of Relator's vulnerability and the reasons for it.

## DEFENDANTS' SCHEMES RESULTED IN FALSE CLAIMS TO MEDICAID AND MEDICARE

275.   Defendants' business plans often included tracking of physicians by their volume of Medicare and Medicaid patients, average duration of treatment, and the average revenue from Defendants' drugs. Defendant management utilized this Medicaid and Medicare volume information in order to determine which physicians to target for expensive meals and cash payments and off-label sales promotions.

276.   Payments of consulting fees and expensive dinners and other incentives to increase referrals to a physician for the use of Defendants' drugs is inappropriate and illegal. According to the federal Health and Human Services Office of the Inspector General (HHS OIG), paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business. See, e.g., 68 F.R. 23738. ("these arrangements [entertainment, recreation, travel, meals, etc.] potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business.")

277.   Defendants' scheme to pay physicians and promote off-label sales resulted in specific sales. Defendants, like most branded drug companies, monitor the relationship of its sales to its promotional efforts over a very short timeframe; Defendants would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over a period of just weeks. Defendants' marketing and sales strategy documents show that at least on a weekly basis Defendants were tracking prescription volume by physician, and tracking the percentage change in prescribing habits of physicians

Complaint for Damages and Demand for Jury Trial

1  for Defendants drugs.

2  278.   Additionally, Defendants tracked the return on investment ("ROI") of paid

3  travel and expensive meals for physicians. Defendants' sales representatives were

4  instructed to ask physicians for additional prescriptions when the physicians were

5  paid to speak at a lavish meal event, and told to track follow-up prescriptions by

6  the physician, and to hold the physicians accountable if the physicians did not

7  increase prescriptions of Defendants' drugs. Physicians were made aware by

8  Defendants' sales representatives that the physicians would not continue to be

9  invited to lavish meals if the physicians did not remain in the high volume

10  prescriber range, and if the physicians did not prescribe Defendants' drugs.

11  Physicians who did not continue to prescribe Defendants' drugs were tracked on a

12  quarterly basis by Defendants' marketing and sales personnel, and were sometimes

13  penalized by being taken off target lists for invitations to future lavish meals and

14  offers of speaking engagements, paid research opportunities, and other perks.

15  279.   Defendants pushed "prescribe to play," quid pro quo-focused sales

16  strategies, which are based entirely on the amount of prescriptions written by the

17  physicians and the ability of the physician to influence other physicians to begin

18  prescribing Defendants' drugs. The recipients of these awards and benefits were

19  selected by Defendants' home office marketing department. Some ROI factors that

20  Defendants' home office used to funnel kickbacks to physicians included but were

21  not limited to the physician recipients' ability to prescribe Defendants' drugs and

22  to influence other physicians to do so.

23  280.   Defendants also instructed its sales representatives to review patient records

24  at physician's offices and instruct them to switch their patients to receive

25  Defendants' drugs instead of competitor drugs.

26  281.   The evidence points to willful and premeditated schemes of off-label

27  promotion, kickbacks, and violations of patients' HIPPA protections. The Relator,

28  _____
-87-

1  who was vocal about these tactics, was retaliated against with unreasonable plans

2  of corrective action and ultimately wrongfully terminated.

3  ## CONCLUSION

4  282.   Defendants' fraudulent activities, as set forth in this Complaint have resulted

5  in significant fraud on the government's health care systems. These concerted,

6  national schemes for fraudulent promotion of Defendants' drugs have resulted in

7  billions of dollars in unnecessary and fraudulent claims for reimbursement

8  increasing the cost of healthcare and wasting the American taxpayer dollar.

9  ## COUNT I; FALSE CLAIMS ACT

10  **CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS**

11  283.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator,

12  ALEXANDER VOLKOFF, LLC, on behalf of the UNITED STATES and on

13  behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA

14  PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the

15  False Claims Act, 31 U.S.C. §§3729-32.

16  284.   Relator realleges and incorporates the allegations above as if fully set for

17  herein and further alleges as follows:

18  285.   The DEFENDANTS, from at least January 1, 2005 to the present date

19  knowingly [as defined in 31 USC, §3729(b)] caused to be presented to officers or

20  employees of the UNITED STATES GOVERNMENT and STATES

21  GOVERNMENTS false or fraudulent claims for payment or approval, in that the

22  DEFENDANTS, caused to be presented to officers or employees of the UNITED

23  STATES GOVERNMENT AND STATES GOVERNMENTS false or fraudulent

24  claims for the specified drugs (as the term "specified drugs" has been defined

25  throughout this Complaint) and caused the UNITED STATES and STATE

26  GOVERNMENTS to pay out sums of money to the healthcare providers and

27  suppliers of the DEFENDANTS' specified drugs, grossly in excess of the amounts

28

-88-

1   permitted by law, resulting in great financial loss to the UNITED STATES and

2   STATE GOVERNMENTS.

3   286.   Because of the DEFENDANT PHARMACEUTICAL

4   MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES

5   suffered actual damages in amount to be proven at trial, all in violation of 31

6   U.S.C. §3729(a)(1).

7   **COUNT II; FALSE CLAIMS ACT**

8   **CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED**

9   **TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY**

10  **THE GOVERNMENT**

11  287.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator,

12  ALEXANDER VOLKOFF, LLC, on behalf of the UNITED STATES and on

13  behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA

14  PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the

15  False Claims Act, 31 U.S.C. §§3729-32.

16  288.   Relator realleges and incorporates the allegations above as if fully set for

17  herein and further alleges as follows:

18  289.   The DEFENDANTS, from At least January 1, 2005 to the present date

19  knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to

20  be made or used to get false or fraudulent claims to be paid or approved by the

21  GOVERNMENT, in that the DEFENDANTS, caused false information about the

22  DEFENDANTS' drugs specified herein to be used by the GOVERNMENT to pay

23  or approve claims presented by healthcare providers and suppliers of the

24  DEFENDANTS' specified drugs, which claims were grossly in excess of the

25  amounts permitted by law, resulting in great financial loss to the UNITED

26  STATES and STATE GOVERNMENTS.

27

28

-89-

Complaint for Damages and Demand for
Jury Trial

290.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

## COUNT III; FALSE CLAIMS ACT

## CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT

291.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

292.      Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

293.      The DEFENDANTS, from at least January 1, 2005 to the present date knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the DEFENDANTS knowingly made, used or caused to be made or used false records or false statements, i.e., the false certifications made or caused to be made by Defendants material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

294.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

## COUNT IV; FALSE CLAIMS ACT

## CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; ILLEGAL RENUMERATION

-90-

295.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

296.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

297.   The DEFENDANTS, from at least 2010 to the present date knew that the prices charged to their customers for the specified drugs were significantly reduced in the amount from the prices and costs represented by the DEFENDANTS and upon which the DEFENDANTS knew the Medicaid claims would be approved and paid. Accordingly, the DEFENDANTS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers on the form of price reductions and/or in the form of illegal remuneration from the States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified drugs for which the DEFENDANTS knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b) and 18 U.S.C.§2

298.   The DEFENDANTS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified drugs to be false and fraudulent claims and caused the claims to be presented to the States' Medicaid Programs for payment and approval in violation of 31 U.S.C. §3729(a)(1).

Complaint for Damages and Demand for
Jury Trial

1    299.   Because of the DEFENDANTS' conduct as set forth in this Count, the

2    UNITED STATES suffered actual damages in excess of One Billion Dollars

3    ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

4    <u>**COUNT V; FALSE CLAIMS ACT**</u>

5    **CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED**

6    **TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY**

7    **THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND**

8    **COMPENSATION ARRANGEMENTS**

9    300.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator,

10   ALEXANDER VOLKOFF, LLC, on behalf of the UNITED STATES and on

11   behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA

12   PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the

13   False Claims Act, 31 U.S.C. §§3729-32.

14   301.   Relator realleges and incorporates the allegations above as if fully set for

15   herein and further alleges as follows:

16   302.   The DEFENDANTS, from at least 2010 to the present date knowingly

17   presented or caused to be presented, prohibited claims or bills to individuals and

18   other entities for designated health services [outpatient prescription drugs]

19   furnished pursuant to prohibited referrals from physicians, physician groups and/or

20   outpatient clinics with which the DEFENDANTS has financial relationships, for

21   which the DEFENDANTS knew that payment would be made, in whole or in part,

22   by the States' Medicaid Programs. Such prohibited referrals, claims bills and

23   compensation arrangements are specifically prohibited by 42 U.S.C.

24   §1395nn(a)(1)(B) and 18 U.S.C. §2.

25   303.   The DEFENDANTS' knowingly made or used or caused referring

26   physicians, physician groups or outpatient clinics to make or use records or

27   statements to get false or fraudulent claims and bills for the DEFENDANTS'

28                                             -92-

1  outpatient prescription drugs to be paid or approved by the States' Medicaid

2  Programs.

3  304.   The DEFENDANTS' knowing presentment or causing others to present,

4  claims or bills to the States' Medicaid programs in violation of 42 U.S.C.

5  §1395nn(a)(1)(B) without disclosing facts revealing said violations constituted the

6  making or using, or the causing others to make or use, false records or statements

7  to get a false or fraudulent claims paid or approved by the GOVERNMENT in

8  violation of 31 U.S.C. §3729(a)(2).

9  305.   Because of the DEFENDANTS' conduct as set forth in this Count, the

10  UNITED STATES suffered actual damages in excess of One Billion Dollars

11  ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(2).

12  <u>**COUNT VI; FALSE CLAIMS ACT**</u>

13  **CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A**

14  **FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID**

15  306.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator,

16  ALEXANDER VOLKOFF, LLC, on behalf of the UNITED STATES and on

17  behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA

18  PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the

19  False Claims Act, 31 U.S.C. §§3729-32.

20  307.   Relator realleges and incorporates the allegations above as if fully set for

21  herein and further alleges as follows:

22  308.   With respect to State Medicaid Programs, this Count also applies to all

23  DEFENDANTS manufacturing specified drugs which: 1) were multiple-source

24  drugs and/or single-source drugs, 2) were subject to State Medicaid reimbursement

25  methodology similar to the Medicare "J Code" methodology, and 3) had a falsely

26  inflated reported AWP and/or WAC or another falsely inflated reported price or

27  cost if such price or cost was utilized in creating an array or prices or costs from

28

-93-

Complaint for Damages and Demand for
Jury Trial

1   which one was selected or reimbursement of all versions of a given drug.

2   309.   Each DEFENDANTS' liability as to this Count extends from the time it first

3   reported a falsely inflated AWP and/or WAC, or in the case of Medicaid, a falsely

4   inflated AWP and/or WAC or such other price cost used to create the array of drug

5   prices or costs, until such time, if any, each DEFENDANT stopped reporting said

6   inflated AWP and/or WAC or, in the case of Medicaid, stopped reporting said

7   inflated AWP and/or WAC or such other reported price or cost used to create the

8   array of drug prices or costs from which one was selected for reimbursement

9   purposes.

10   310.   Because of the DEFENDANTS' conduct as set forth in this Count, the

11   UNITED STATES suffered actual damages in excess of One Billion Dollars

12   ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(3).

### COUNT VII

**(Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq.*)**

311.   Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

312.   Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business

in the State of Arkansas. Upon information and belief, Defendants' actions

described herein occurred in the State of Arkansas as well. This is a qui tam action

brought by Relator and the State of Arkansas to recover treble damages and civil

penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-

901 et seq.

313.   The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides

liability for any person who knowingly makes or causes to be made any false

statement or representation of a material fact in any application for any benefit or

payment under the Arkansas Medicaid program;

-94-

Complaint for Damages and Demand for
Jury Trial

314.   At any time knowingly makes or causes to be made any false   statement or representation of a material fact for use in determining rights to a benefit or payment;

315.   In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

316.   Defendants violated the Arkansas Medicaid Fraud False Claims Act §20-77-902(1) (2) & (7)(A) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

317.   Defendants furthermore violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to the State of Arkansas from at least 2005 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described   herein.

318.   The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

319.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas is connection with Defendants' fraudulent and illegal practices.

320.   Had the State of Arkansas known that Defendants was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

-95-

Complaint for Damages and Demand for Jury Trial

321.   As a result of Defendants' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

322.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, and brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of themselves and the State of Arkansas.

323.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

324.   Pursuant to the Arkansas Medicaid Fraud False Claims Act, the State  of Arkansas and Relator are entitled to the following damages as against  Defendants:

325.   To the STATE OF ARKANSAS:

326.   Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendants' fraudulent and illegal practices;

327.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Arkansas;

328.   Prejudgment interest; and

329.   All costs incurred in bringing this action.

330.   To RELATOR:

331.   The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law;

332.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

333.   An award of reasonable attorneys' fees and costs; and

334.   Such further relief as this court deems equitable and just.

/ / /

-96-

## COUNT VIII

### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

335.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

336.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of California. Upon information and belief, Defendants' actions described herein occurred in the State of California as well.

337.   This is a qui tam action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

338.   Cal. Gov't Code § 12651(a) provides liability for any person who—

339.   Knowingly presents, or causes to be presented, to an officer or employee of the state of any political division thereof, a false claim for payment or approval;

340.   Knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision;

341.   Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state of by any political subdivision.

342.   Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

343.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

344.   Defendants violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf.

-97-

& Inst. Code § 14107.2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

345.   Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2005 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

346.   The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

347.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

348.   Had the State of California known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

349.   As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

350.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

351.   This Court is requested to accept supplemental jurisdiction over this related

Complaint for Damages and Demand for Jury Trial

state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

352.   Pursuant to the California False Claims Act, the State of California and Relator are entitled to the following damages as against Defendants:

353.   To the STATE OF CALIFORNIA:

354.   Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices;

355.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of California;

356.   Prejudgment interest; and

357.   All costs incurred in bringing this action.

358.   To RELATOR:

359.   The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

360.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

361.   An award of reasonable attorneys' fees and costs; and

362.   Such further relief as this Court deems equitable and just.

## COUNT IX

**(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 *et seq.*)**

363.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

364.   This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act.

365.   By virtue of the acts described above, Defendants knowingly utilized a

-99-

Complaint for Damages and Demand for Jury Trial

1   scheme by which they improperly procured "runners, cappers, steerers, and other

2   persons" to procure patients who held private insurance contracts and against

3   whom Defendants could cause the filing of claims for payment. *See* Cal. Ins. Code

4   § 1871.7(a).

5   366.   Defendants knowingly presented, or caused to be presented, false or

6   fraudulent claims to the private insurers in California, or for patients in California

7   those insurers covered, for payment or approval in violation of each patient's

8   private health insurance contract.

9   367.   By virtue of the acts described above, Defendants knowingly made, used, or

10   caused to be made or used false records and statements and omitted material facts

11   to induce the private insurers in California, or for patients in California covered by

12   those insurers, to approve or pay such false and fraudulent claims.

13   368.   By virtue of the acts described above, the Defendants conspired to violate

14   the California Insurance Fraud Prevention Act and each patient's private health

15   insurance contract.

16   369.   The private insurers in California, or those insurers that covered patients in

17   California, unaware of the falsity of the records, statements, and claims made,

18   used, presented, or caused to be presented by Defendants, paid and continue to pay

19   the claims that are non-payable as a result of Defendants' illegal conduct.

20   370.   Defendants knowingly submitted and/or caused to be made or used false

21   records or false statements in order to avoid or decrease their respective obligations

22   to return overpayments to these private insurance companies.

23   371.   By reason of Defendants' acts, these private insurance companies have been

24   damaged, and continue to be damaged, in a substantial amount to be determined at

25   trial.

26   372.   Each claim for reimbursement that was a result of the Defendants' scheme

27   represents a false or fraudulent record or statement and a false or fraudulent claim

28

1  for payment.

2  373.  The State of California is entitled to the maximum penalty of $10,000.00 for

3  each and every false or fraudulent claim, record, or statement made, used,

4  presented, or caused to be made, used, or presented by Defendants.

5  374.  WHEREFORE, Relators request the following relief:

6  375.  That this Court enter judgment against Defendants in an amount equal to

7  three times the amount of damages that the private insurance companies have

8  sustained because of Defendants' actions, plus a civil penalty of not less than

9  $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code §

10 1871.7(a) and (b);

11 376.  At least thirty percent (30%) and up to forty percent (40%) of the proceeds

12 of this action to the Relators if the State of California elects to intervene, and forty

13 percent (40%) to fifty percent (50%) if it does not;

14 377.  Relators' attorneys' fees, litigation and investigation costs, and other related

15 expenses; and

16 378.  Such other relief as the Court deems just and appropriate.

## COUNT X

**(Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.*)**

18
19 379.  Relator re-allege and incorporate the allegations above as if fully set for

20 herein and further alleges as follows.

21 380.  Additionally, Relator state that the course of conduct described in this

22 Complaint was a nationwide practice of Defendants. Defendants conduct business

23 in the State of Colorado. Upon information and belief, Defendants' actions

24 described herein occurred in the State of Colorado as well.

25 381.  This is a qui tam action brought by Relator and the State of Colorado to

26 recover treble damages and civil penalties under the Colorado Medicaid False

27 Claims Act, Colorado Revised Statutes § 25.5-4-303.5. *et seq.*

Complaint for Damages and Demand for
Jury Trial

382.  Colorado Revised Statutes § 25.5-4-305 provides liability for any person who-

383.  Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

384.  Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

385.  Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

386.  Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

387.  Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

388.  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;"

389.  Conspires to commit a violation of paragraphs (a) to (f) of this subsection.

390.  Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

Complaint for Damages and Demand for Jury Trial

391.   Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

392.   The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

393.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' fraudulent and illegal practices.

394.   Had the State of Colorado known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

395.   As a result of Defendants' violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

396.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Colorado Revised Statutes § 25.5-4-306(2) on behalf of itself and the State of Colorado.

397.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

Complaint for Damages and Demand for
Jury Trial

398.   Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado and Relator are entitled to the following damages as against Defendants:

399.   To the STATE OF COLORADO:

400.   Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' fraudulent and illegal practices;

401.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Colorado;

402.   Prejudgment interest; and

403.   All costs incurred in bringing this action.

404.   To RELATOR:

405.   The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

406.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

407.   An award of reasonable attorneys' fees and costs; and

408.   Such further relief as this court deems equitable and just.

## COUNT XI

### (Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. *et seq.*)

409.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

410.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Connecticut. Upon information and belief, Defendants' actions described herein occurred in the State of Connecticut as well.

411.   This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act

-104-

for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. *et seq.*

412.   Connecticut General Statutes § 17b-301b. provides liability for any person who-

413.   Knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

414.   Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

415.   Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

416.   Defendants violated Connecticut General Statutes § 17b-301b from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

417.   Defendants furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

418.   The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

419.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and

Complaint for Damages and Demand for Jury Trial

1    belief, also an express condition of payment of claims submitted to the State of

2    Connecticut in connection with Defendants' fraudulent and illegal practices.

3    420.   Had the State of Connecticut known that Defendants were violating the

4    federal and state laws cited herein, it would not have paid the claims submitted by

5    health care providers and third party payers in connection with Defendants'

6    fraudulent and illegal practices.

7    421.   As a result of Defendants' violations of Connecticut General Statutes § 17b-

8    301b the State of Connecticut has been damaged in an amount far in excess of

9    millions of dollars exclusive of interest.

10   422.   Relator have direct and independent knowledge of the allegations of this

11   Complaint, who have brought this action pursuant to Connecticut General Statutes

12   § 17b-301d on behalf of itself and the State of Connecticut.

13   423.   This Court is requested to accept supplemental jurisdiction of this related

14   state claim as it is predicated upon the exact same facts as the federal claim, and

15   merely asserts separate damage to the State of Connecticut in the operation of its

16   Medicaid program.

17   424.   Pursuant to the Connecticut False Claims Act for Medical Assistance

18   Programs, the State of Connecticut and Relator are entitled to the following

19   damages as against Defendants:

20   425.   To the STATE OF CONNECTICUT:

21   426.   Three times the amount of actual damages which the State of Connecticut

22   has sustained as a result of Defendants' fraudulent and illegal practices;

23   427.   A civil penalty of not less than $5,500 and not more than $11,000 for each

24   false claim which Defendants caused to be presented to the State of Connecticut;

25   428.   Prejudgment interest; and

26   429.   All costs incurred in bringing this action.

27   430.   To RELATOR:

28
-106-
Complaint for Damages and Demand for
Jury Trial

431.   The maximum amount allowed pursuant to Connecticut General Statutes § 17b-301 and /or any other applicable provision of law;

432.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

433.   An award of reasonable attorneys' fees and costs; and

434.   Such further relief as this court deems equitable and just.

## COUNT XII

## (Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*)

435.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

436.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Delaware. Upon information and belief, Defendants' actions described herein occurred in Delaware as well.

437.   This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*

438.   6 Del. C. § 1201 *et seq.* provides liability for any person who—

439.   Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

440.   Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

441.   Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

442.   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit

-107-

Complaint for Damages and Demand for Jury Trial

1   money or property to or from the Government.

2   443.   Further, 31 Del. C. § 1005 provides that— It shall be unlawful for any

3   person to offer or pay any remuneration (including any kickback, bribe or rebate)

4   directly or indirectly, in cash or in kind to induce any other person . . . [t]o

5   purchase, lease, order or arrange for or recommend purchasing, leasing or ordering

6   any property, facility, service, or item of medical care or medical assistance for

7   which payment may be made in whole or in part under any public assistance

8   program.

9   444.   Defendants violated 6 Del. C. § 1201 and knowingly caused hundreds of

10   thousands of false claims to be made, used and presented to the State of Delaware

11   from 2005 to the present by its violation of federal and state laws, including 31

12   Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as

13   described herein.

14   445.   The State of Delaware, by and through the Delaware Medicaid program and

15   other state health care programs, and unaware of Defendants' fraudulent and illegal

16   practices, paid the claims submitted by health care providers and third party payers

17   in connection therewith.

18   446.   Compliance with applicable Medicare, Medicaid and the various other

19   federal and state laws cited herein was an implied, and upon information and

20   belief, also an express condition of payment of claims submitted to the State of

21   Delaware in connection with Defendants' fraudulent and illegal practices.

22   447.   Had the State of Delaware known that Defendants were violating the federal

23   and state laws cited herein, it wound not have paid the claims submitted by health

24   care providers and third party payers in connection with Defendants' fraudulent

25   and illegal practices.

26   448.   As a result of Defendants' violations of 6 Del C. § 1201(a), the State of

27   Delaware has been damage in an amount far in excess of millions of dollars

28

Complaint for Damages and Demand for
Jury Trial

exclusive of interest.

449. Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

450. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

451. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

452. Pursuant to the Delaware Medicaid False Claims Act, the State of Delaware and Relator are entitled to the following damages as against Defendants:

453. To the STATE OF DELAWARE:

454. Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices;

455. A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

456. Prejudgment interest; and

457. All costs incurred in bringing this action.

458. To RELATOR:

459. The maximum amount allowed pursuant to 6 Del C. § 1205, and /or any other applicable provision of law;

460. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

-109-

Complaint for Damages and Demand for Jury Trial

461.   An award of reasonable attorneys' fees and costs; and

462.   Such further relief as this court deems equitable and just.

## COUNT XIII

### (District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq.*)

463.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

464.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the District of Columbia. Upon information and belief, Defendants' actions described herein occurred in the District of Columbia as well.

465.   This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq.*

466.   D.C. Code § 2-30814(a) provides liability for any person who-

467.   Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

468.   Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

469.   Conspires to defraud the District by getting a false claim allowed or paid by the District;

470.   Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

471.   In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

472.   Referring a recipient to a particular provider of any item or service or for

-110-

Complaint for Damages and Demand for
Jury Trial

1  which payment may be made under the District of Columbia Medicaid program; or

2  473.   Recommending the purchase, lease, or order of any good, facility, service, or

3  item for which payment may be made under the District of Columbia Medicaid

4  Program.

5  474.   Defendants violated D. C. Code § 4-802(c) from at least 2005 to the present

6  by engaging in the fraudulent and illegal practices described herein.

7  475.   Defendants furthermore violated D. C. Code § 2-308.14(a) and knowingly

8  caused thousands of false claims to be made, used and presented to the District of

9  Columbia from at least 2005 to the present by its violation of federal and state

10  laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act,

11  as described herein.

12  476.   The District of Columbia, by and through the District of Columbia Medicaid

13  program and other state health care programs, and unaware of Defendants'

14  fraudulent and illegal practices, paid the claims submitted by health care providers

15  and third party payers in connection therewith.

16  477.   Compliance with applicable Medicare, Medicaid and the various other

17  federal and state laws cited herein was an implied, and upon information and

18  belief, also an express condition of payment of claims submitted to the District of

19  Columbia in connection with Defendants' fraudulent and illegal practices.

20  478.   Had the District of Columbia known that Defendants were violating the

21  federal and state laws cited herein, it would not have paid the claims submitted by

22  health care providers and third party payers in connection with Defendants'

23  fraudulent and illegal practices.

24  479.   As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District

25  of Columbia has been damaged in an amount far in excess of millions of dollars

26  exclusive of interest.

27  480.   Relator are private persons with direct and independent knowledge of the

28

-111-

Complaint for Damages and Demand for Jury Trial

allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

481. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

482. Pursuant to the District of Columbia Procurement Reform Amendment Act, the District of Columbia and Relator are entitled to the following damages as against Defendants:

483. To the DISTRICT OF COLUMBIA:

484. Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal practices;

485. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the District of Columbia;

486. Prejudgment interest; and

487. All costs incurred in bringing this action.

488. To RELATOR:

489. The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any other applicable provision of law;

490. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

491. An award of reasonable attorneys' fees and costs; and

492. Such further relief as this court deems equitable and just.

## COUNT XIV

### (Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*)

493. Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

-112-

494. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Florida. Upon information and belief, Defendants' actions described herein occurred in the State of Florida as well.

495. This is a qui tam action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 *et seq.*

496. West's F.S.A. § 68.082 provides liability for any person who-

497. Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval

498. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency

499. Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid

500. Defendants violated West's F.S.A. § 68.082 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

501. Defendants furthermore violated West's F.S.A. § 68.082 and knowingly caused thousands of false claims to be made, used and presented to the State of Florida from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

502. The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

503. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of

-113-

Complaint for Damages and Demand for Jury Trial

Florida in connection with Defendants' fraudulent and illegal practices.

504.   Had the State of Florida known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

505.   As a result of Defendants' violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

506.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of themselves and the State of Florida.

507.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

508.   Pursuant to the Florida False Claims Act, the State of Florida and Relator are entitled to the following damages as against Defendants:

509.   To the STATE OF FLORIDA:

510.   Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' fraudulent and illegal practices;

511.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida;

512.   Prejudgment interest; and

513.   All costs incurred in bringing this action.

514.   To RELATOR:

515.   The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

-114-

Complaint for Damages and Demand for Jury Trial

516.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

517.   An award of reasonable attorneys' fees and costs; and

518.   Such further relief as this court deems equitable and just.

## COUNT XV

**(Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*)**

519.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

520.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Georgia. Upon information and belief, Defendants' actions described herein occurred in Georgia as well.

521.   This is a qui tam action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*

522.   Ga. Code Ann. § 49-4-168.1 *et seq.* provides liability for any person who—

523.   Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

524.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

525.   Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

526.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

527.   Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused

-115-

Complaint for Damages and Demand for Jury Trial

1   hundreds of thousands of false claims to be made, used and presented to the State

2   of Georgia from 2005 to the present by its violation of federal and state laws,

3   including the Anti-Kickback Act and the Stark Act, as described herein.

4   528.   The State of Georgia, by and through the Georgia Medicaid program and

5   other state health care programs, and unaware of Defendants' fraudulent and illegal

6   practices, paid the claims submitted by health care providers and third party payers

7   in connection therewith.

8   529.   Compliance with applicable Medicare, Medicaid and the various other

9   federal and state laws cited herein was an implied, and upon information and

10   belief, also an express condition of payment of claims submitted to the State of

11   Georgia in connection with Defendants' fraudulent and illegal practices.

12   530.   Had the State of Georgia known that Defendants were violating the federal

13   and state laws cited herein, it wound not have paid the claims submitted by health

14   care providers and third party payers in connection with Defendants' fraudulent

15   and illegal practices.

16   531.   As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the

17   State of Georgia has been damaged in an amount far in excess of millions of

18   dollars exclusive of interest.

19   532.   Defendants did not, within 30 days after it first obtained information as to

20   such violations, furnish such information to officials of the State responsible for

21   investigating false claims violations, did not otherwise fully cooperate with any

22   investigation of the violations, and have not otherwise furnished information to the

23   State regarding the claims for reimbursement at issue.

24   533.   Relator are private persons with direct and independent knowledge of the

25   allegations of this Complaint, who have brought this action pursuant to Ga. Code

26   Ann., § 49-4-168.2(b) on behalf of themselves and the State of Georgia.

27   534.   This Court is requested to accept supplemental jurisdiction of this related

28                                          -116-

1   state claim as it is predicated upon the exact same facts as the federal claim, and

2   merely asserts separate damage to the State of Georgia in the operation of its

3   Medicaid program.

4   535.   Pursuant to the Georgia State False Medicaid Claims Act, the State of

5   Georgia and Relator are entitled to the following damages as against Defendants:

6   536.   To the STATE OF GEORGIA:

7   537.   Three times the amount of actual damages which the State of Georgia has

8   sustained as a result of Defendants' fraudulent and illegal practices;

9   538.   A civil penalty on not less than $5,500 and not more than $ 11,000 for each

10  false claim which Defendants caused to be presented to the State of Georgia;

11  539.   Prejudgment interest; and

12  540.   All costs incurred in bringing this action.

13  541.   To RELATOR:

14  542.   The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i),

15  and/ or any other applicable provision of law;

16  543.   Reimbursement for reasonable expenses which Relator incurred in

17  connection with this action;

18  544.   An award of reasonable attorneys' fees and costs; and

19  545.   Such further relief as this Court deems equitable and just.

20              **COUNT XVI**

21  **(Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*)**

22  546.   Relator re-allege and incorporate the allegations above as if fully set for

23  herein and further alleges as follows.

24  547.   Additionally, Relator state that the course of conduct described in this

25  Complaint was a nationwide practice of Defendants. Defendants conduct business

26  in the State of Hawaii. Upon information and belief, Defendants' actions described

27  herein occurred in Hawaii as well.

28

-117-

548.   This is a qui tam action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*

549.   Haw. Rev. Stat. § 661-21(a) provides liability for any person who—

550.   Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

551.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

552.   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

553.   Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

554.   Defendants violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

555.   The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

556.   Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' fraudulent and illegal practices.

557.   Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health

-118-

1  care providers and third party payers in connection with Defendants' fraudulent

2  and illegal practices.

3  558.   As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the

4  State of Hawaii has been damaged in an amount far in excess of millions of dollars

5  exclusive of interest.

6  559.   Relator are private persons with direct and independent knowledge of the

7  allegations of this Complaint, who have brought this action pursuant to Haw. Rev.

8  Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

9  560.   This Court is requested to accept supplemental jurisdiction of this related

10  state claim as it is predicated upon the exact same facts as the federal claim, and

11  merely asserts separate damage to the State of Hawaii in the operation of its

12  Medicaid program.

13  561.   Pursuant to the Hawaii False Claims Act, the State of Hawaii and Relator are

14  entitled to the following damages as against Defendants:

15  562.   To the STATE OF HAWAII:

16  563.   Three times the amount of actual damages which the State of Hawaii has

17  sustained as a result of Defendants' fraudulent and illegal practices;

18  564.   A civil penalty of not less than $5,500 and not more than $11,000 for each

19  false claim which Defendants caused to be presented to the State of Hawaii;

20  565.   Prejudgment interest; and

21  566.   All costs incurred in bringing this action.

22  567.   To RELATOR:

23  568.   The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or

24  any other applicable provision of law;

25  569.   Reimbursement for reasonable expenses which Relator incurred in

26  connection with this action; and

27  570.   Such further relief as this Court deems equitable and just.

28

Complaint for Damages and Demand for
Jury Trial

## COUNT XVII

**(Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*)**

571.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

572.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Illinois. Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

573.    This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

574.    740 ILCS 175/3(a) provides liability for any person who—

575.    knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

576.    knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

577.    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

578.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

579.    Defendants violated 305 ILCS 5/8A-3(b) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

580.    Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused

Complaint for Damages and Demand for
Jury Trial

1   hundreds of thousands of false claims to be made, used and presented to the State

2   of Illinois from at least 2005 to the present by its violation of federal and state

3   laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as

4   described herein.

5   581.   The State of Illinois, by and through the Illinois Medicaid program and other

6   state health care programs, and unaware of Defendants' fraudulent and illegal

7   practices, paid the claims submitted by health care providers and third party payers

8   in connection therewith.

9   582.   Compliance with applicable Medicare, Medicaid and the various other

10   federal and state laws cited herein with an implied, and upon information and

11   belief, also an express condition of payment of claims submitted to the State of

12   Illinois in connection with Defendants' fraudulent and illegal practices.

13   583.   Had the State of Illinois known that Defendants were violating the federal

14   and state laws cited herein, it would not have paid the claims submitted by health

15   care providers and third party payers in connection with Defendants' fraudulent

16   and illegal practices.

17   584.   As a result of Defendants' violations of 740 ILCS 175/3(a), the State of

18   Illinois has been damaged in an amount far in excess of millions of dollars

19   exclusive of interest.

20   585.   Relator are private persons with direct and independent knowledge of the

21   allegation of this Complaint, who have brought this action pursuant to 740 ILCS

22   175/3(b) on behalf of themselves and the State of Illinois.

23   586.   This court is requested to accept supplemental jurisdiction of this related

24   state claim as it is predicated upon the exact same facts as the federal claim, and

25   merely asserts separate damage to the State of Illinois in the operation of its

26   Medicaid program.

27   587.   Pursuant to the Illinois Whistleblower Reward and Protection Act, the State

28

Complaint for Damages and Demand for
Jury Trial

1    of Illinois and Relator are entitled to the following damages as against Defendants:

2    588.    To the STATE OF ILLINOIS:

3    589.    Three times the amount of actual damages which the State of Illinois has

4    sustained as a result of Defendants' fraudulent and illegal practices;

5    590.    A civil penalty of not less than $5,500 and not more than $11,000 for each

6    false claim which Defendants caused to be presented to the State of Illinois;

7    591.    Prejudgment interest; and

8    592.    All costs incurred in bringing this action.

9    593.    To RELATOR:

10    594.    The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other

11    applicable provision of law;

12    595.    Reimbursement for reasonable expenses which Relator incurred in

13    connection with this action;

14    596.    An award of reasonable attorneys' fees and costs; and

15    597.    Such further relief as this Court deems equitable and just.

16    <u>**COUNT XVIII**</u>

17    **(Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*)**

18    598.    Relator re-allege and incorporate the allegations above as if fully set for

19    herein and further alleges as follows.

20    599.    This is a claim for treble damages and penalties under the Illinois Insurance

21    Claims Fraud Prevention Act.

22    600.    By virtue of the acts described above, Defendants knowingly offered and/or

23    paid remuneration to physicians to induce the procurement of patients for

24    Defendants' drugs for which Defendants could cause the filing of claims for

25    payment from the patients' insurers. *See* 740 Ill. Comp. Stat. § 92/5(a).

26    601.    Defendants knowingly presented or caused to he presented false or

27    fraudulent claims to the private insurers in Illinois, or for patients in Illinois those

28   

-122-

Complaint for Damages and Demand for<br>Jury Trial

1  insurers covered, for payment or approval in violation of each patient's private

2  health insurance contract.

3  602.   By virtue of the acts described above, Defendants knowingly made, used, or

4  caused to be made or used false records and statements and omitted material facts

5  to induce the private insurers in Illinois, or for patients in Illinois covered by those

6  insurers, to approve or pay such false and fraudulent claims.

7  603.   By virtue of the acts described above, the Defendants conspired to violate

8  the Illinois Insurance Claims Fraud Prevention Act and each patient's private health

9  insurance contract.

10  604.   The private insurers in Illinois, or those insurers that covered patients in

11  Illinois, unaware of the falsity of the records, statements, and claims made, used,

12  presented, or caused to be presented by Defendants, paid and continue to pay the

13  claims that are non-payable as a result of Defendants' illegal conduct.

14  605.   Defendants knowingly submitted and/or caused to be made or used false

15  records or false statements in order to avoid or decrease their respective obligations

16  to return overpayments to these private insurance companies.

17  606.   By reason of Defendants' acts, these private insurance companies have been

18  damaged, and continue to be damaged, in a substantial amount to be determined at

19  trial.

20  607.   Each claim for reimbursement that was a result of the Defendants' scheme

21  represents a false or fraudulent record or statement and a false or fraudulent claim

22  for payment.

23  608.   The State of Illinois is entitled to the maximum penalty of $10,000.00 for

24  each and every false or fraudulent claim, record, or statement made, 'used,

25  presented, or caused to be made, used, or presented by Defendants.

26  609.   WHEREFORE, Relators request the following relief:

27  610.   That this Court enter judgment against Defendants in an amount equal to

28

Complaint for Damages and Demand for
Jury Trial

1   three times the amount of damages that the private insurance companies have

2   sustained because of Defendants' actions, plus a civil penalty of not less tl1an

3   $5,000,00 and not more than $10,000.00 for each violation of 740 Ill. Comp. Stat.

4   §§ 92/5(a) and (b);

5   611.   No less than thirty percent (30%) of the proceeds of this action to the

6   Relators if the State of Illinois elects to intervene, and no less than forty percent

7   (40%) if it does not;

8   612.   Relators' attorneys' fees, litigation and investigation costs, and other related

9   expenses; and

10   613.   Such other relief as the Court deems just and appropriate.

## COUNT XIX

**(Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq*.)**

13   614.    Relator re-allege and incorporate the allegations above as if fully set for

14   herein and further alleges as follows.

15   615.   Additionally, Relator state that the course of conduct described in this

16   Complaint was a nationwide practice of Defendants.  Defendants conduct business

17   in the State of Indiana. Upon information and belief, Defendants' actions described

18   herein occurred in Indiana as well.

19   616.   This is a qui tam action brought by Relator and the State of Indiana to

20   recover treble damages and civil penalties under the Indiana False Claims and

21   Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

22   617.   IC 5-11-5.5-2 provides liability for any person who—

23   618.   presents a false claim to the state for payment or approval;

24   619.   makes or uses a false record or statement to obtain payment or approval of a

25   false claim from the state;

26   620.   with intent to defraud the state, delivers less money or property to the state

27   than the amount recorded on the certificate or receipt the person receives from the

28

Complaint for Damages and Demand for
Jury Trial

1  state;

2  621.  with intent to defraud the state, authorizes issuance of a receipt without

3  knowing that the information on the receipt is true;

4  622.  receives public property as a pledge of an obligation on a debt from an

5  employee who is not lawfully authorized to sell or pledge the property;

6  623.  makes or uses a false record or statement to avoid an obligation to pay or

7  transmit property to the state;

8  624.  conspires with another person to perform an act described in subdivisions (a)

9  through (f); or

10  625.  causes or induces another person to perform an act described in subdivisions

11  (a) through (f).

12  626.  In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a

13  kickback or bribe in connection with the furnishing of items or services or the

14  making or receipt of the payment under the Indiana Medicaid program.

15  627.  Defendants violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2005 to

16  the present by engaging in the fraudulent and illegal practices described herein.

17  628.  Defendants furthermore violated IC 5-11-5.5-2 and knowingly caused

18  hundreds of thousands of false claims to be made, used and presented to the State

19  of Indiana from at least 2005 to the present by its violation of federal and state

20  laws, including IC 12-15-24-1 & IC 12-15-24-2, the Anti-Kickback Act and the

21  Stark Act, as described herein.

22  629.  The State of Indiana, by and through the Indiana Medicaid program and

23  other state health care programs, and unaware of Defendants' fraudulent and illegal

24  practices, paid the claims submitted by health care providers and third party payers

25  in connection therewith.

26  630.  Compliance with applicable Medicare, Medicaid and the various other

27  federal and state laws cited herein with an implied, and upon information and

28

Complaint for Damages and Demand for
Jury Trial

belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' fraudulent and illegal practices.

631.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

632.    As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

633.    Relator are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to IC 5-11-5.5-4 on behalf of themselves and the State of Indiana.

634.    This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

635.    Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana and Relator are entitled to the following damages as against Defendants:

636.    To the STATE OF INDIANA:

637.    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' fraudulent and illegal practices;

638.    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

639.    Prejudgment interest; and

640.    All costs incurred in bringing this action.

641.    To RELATOR:

-126-

642. The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law;

643. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

644. An award of reasonable attorneys' fees and costs; and

645. Such further relief as this Court deems equitable and just.

<u>**COUNT XX**</u>

**(Iowa False Claims Act, Iowa Code § 685.1 *et seq.*)**

646. Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

647. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Iowa. Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

648. This is a qui tam action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 *et seq.*

649. Iowa Code § 685.2 provides liability for any person who—

650. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

651. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

652. Conspires to commit a violation of paragraphs (a), (b), (d)-(g);

653. Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of that money or property;

654. Is authorized to make or deliver a document certifying receipt of property

-127-

1    used, or to be used, by the state and, intending to defraud the state, makes or

2    delivers the receipt without completely knowing that the information on the receipt

3    is true;

4    655.   Knowingly buys, or receives as a pledge of an obligation or debt, public

5    property from an officer or employee of the state, or a member of the Iowa national

6    guard, who lawfully may not sell or pledge property;

7    656.   Knowingly makes, uses, or causes to be made or used, a false record or

8    statement material to an obligation to pay or transmit money or property to the

9    state, or knowingly conceals or knowingly and improperly avoids or decreases an

10   obligation to pay or transmit money or property to the state.

11   657.   Defendants violated Iowa Code § 685.2 from at least 2005 to the present by

12   engaging in the fraudulent and illegal practices described herein.

13   658.   Defendants furthermore violated Iowa Code § 685.2 and knowingly caused

14   hundreds of thousands of false claims to be made, used and presented to the State

15   of Iowa from at least 2005 to the present by its violation of federal and state laws,

16   including the Anti-Kickback Act and the Stark Act, as described herein.

17   659.   The State of Iowa, by and through the Iowa Medicaid program and other

18   state health care programs, and unaware of Defendants' fraudulent and illegal

19   practices, paid the claims submitted by health care providers and third party payers

20   in connection therewith.

21   660.   Compliance with applicable Medicare, Medicaid and the various other

22   federal and state laws cited herein with an implied, and upon information and

23   belief, also an express condition of payment of claims submitted to the State of

24   Iowa in connection with Defendants' fraudulent and illegal practices.

25   661.   Had the State of Iowa known that Defendants were violating the federal and

26   state laws cited herein, it would not have paid the claims submitted by health care

27   providers and third party payers in connection with Defendants' fraudulent and

28

Complaint for Damages and Demand for
Jury Trial

1   illegal practices.

2   662.   As a result of Defendants' violations of Iowa Code § 685.2, the State of

3   Iowa has been damaged in an amount far in excess of millions of dollars exclusive

4   of interest.

5   663.   Relator are private persons with direct and independent knowledge of the

6   allegation of this Complaint, who have brought this action pursuant to Iowa Code §

7   685.3(2)(a) on behalf of themselves and the State of Iowa.

8   664.   This court is requested to accept supplemental jurisdiction of this related

9   state claim as it is predicated upon the exact same facts as the federal claim, and

10   merely asserts separate damage to the State of Iowa in the operation of its

11   Medicaid program.

12   665.   Pursuant to the Iowa False Claims Act, the State of Iowa and Relator are

13   entitled to the following damages as against Defendants:

14   666.   To the STATE OF IOWA:

15   667.   Three times the amount of actual damages which the State of Iowa has

16   sustained as a result of Defendants' fraudulent and illegal practices;

17   668.   A civil penalty for each false claim which Defendants caused to be presented

18   to the State of Iowa;

19   669.   Prejudgment interest; and

20   670.   All costs incurred in bringing this action.

21   671.   To RELATOR:

22   672.   The maximum amount allowed pursuant to Iowa Code § 685.3(4)(a)(1)

23   and/or any other applicable provision of law;

24   673.   Reimbursement for reasonable expenses which Relator incurred in

25   connection with this action;

26   674.   An award of reasonable attorneys' fees and costs; and

27   675.   Such further relief as this Court deems equitable and just.

28

Complaint for Damages and Demand for
Jury Trial

## **COUNT XXI**

### **(Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq.*)**

676.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

677.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Louisiana. Upon information and belief, Defendants' actions described herein occurred in Louisiana as well.

678.    This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq.*

679.    La. Rev. Stat. Ann. § 438.3 provides –

680.    No person shall knowingly present or cause to be presented a false or fraudulent claim;

681.    No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds;

682.    No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

683.    In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

684.    Defendants violated La. Rev. Stat. Ann § 438.2(A) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

Complaint for Damages and Demand for
Jury Trial

685.   Defendants furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2005 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

686.   The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

687.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' fraudulent and illegal practices.

688.   Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

689.   As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

690.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of themselves and the State of Louisiana.

691.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

692.  Pursuant to the Louisiana Medical Assistance Programs Integrity Law, the State of Louisiana and Relator are entitled to the following damages as against Defendants:

693.  To the STATE OF LOUISIANA:

694.  Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices;

695.  A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

696.  Prejudgment interest; and

697.  All costs incurred in bringing this action.

698.  To RELATOR:

699.  The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

700.  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

701.  An award or reasonable attorneys' fees and costs; and

702.  Such further relief as this Court deems equitable and just.

## COUNT XXII

**(Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq*.)**

703.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

704.  Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Maryland. Upon information and belief, Defendants' actions described herein occurred in Maryland as well.

705.  This is a qui tam action brought by Relator and the State of Maryland to

Complaint for Damages and Demand for
Jury Trial

1   recover treble damages and civil penalties under the Maryland Medicaid False

2   Claims Against State Health Plans and State Health Programs Act, Annotated

3   Code of Maryland § 2-601 *et seq.*

4   706.   Annotated Code of Maryland § 2-602 provides liability for any person who-

5   707.   Knowingly presents or causes to be presented a false or fraudulent claim for

6   payment or approval;

7   708.   Knowingly makes, uses, or causes to be made or used a false record or

8   statement material to a false or fraudulent claim;

9   709.   Conspires to commit a violation under this subtitle;

10   710.   Has possession, custody, or control of money or other property used by or on

11   behalf of the State under a State health plan or a State health program and

12   knowingly delivers or causes to be delivered to the State less than all of that money

13   or other property;

14   711.   Knowingly makes any other false or fraudulent claim against a State health

15   plan or a State health program.

16   712.   Defendants violated the Annotated Code of Maryland § 2-602 from at least

17   2005 to the present by engaging in the fraudulent and illegal practices described

18   herein.

19   713.   Defendants furthermore violated the Annotated Code of Maryland § 2-602

20   and knowingly caused thousands of false claims to be made, used and presented to

21   the State of Maryland from at least 2005 to the present by its violation of federal

22   and state laws, including the Anti-Kickback Act, and the Stark Act, as described

23   herein.

24   714.   The State of Maryland, by and through the State of Maryland Medicaid

25   program and other state health care programs, and unaware of Defendants'

26   fraudulent and illegal practices, paid the claims submitted by health care providers

27   and third payers in connection therewith.

28

-133-

Complaint for Damages and Demand for
Jury Trial

715.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' fraudulent and illegal practices.

716.  Had the State of Maryland known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

717.  As a result of Defendants' violations of the Annotated Code of Maryland § 2-602 the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

718.  Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Annotated Code of Maryland § 2-604 on behalf of themselves and the State of Maryland.

719.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

720.  Pursuant to the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, the State of Maryland and Relator are entitled to the following damages as against Defendants:

721.  To the STATE OF MARYLAND:

722.  Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' fraudulent and illegal practices;

723.  A civil penalty of not less than the amount of the actual damages the State health plan or State health program incurs as a result of the violation, and not more than $10,000 for each false claim which Defendants caused to be presented to the

1    State of Maryland;

2    724.   Prejudgment interest; and

3    725.   All costs incurred in bringing this action.

4    726.   To RELATOR:

5    727.   The maximum amount allowed pursuant to the Annotated Code of Maryland

6    § 2-605 and /or any other applicable provision of law;

7    728.   Reimbursement for reasonable expenses which Relator incurred in

8    connection with this action;

9    729.   An award of reasonable attorneys' fees and costs; and

10   730.   Such further relief as this court deems equitable and just.

11                              **COUNT XXIII**

12   **(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A)** *et*

13                                  *seq.*)

14   731.   Relator re-allege and incorporate the allegations above as if fully set for

15   herein and further alleges as follows.

16   732.   Additionally, Relator state that the course of conduct described in this

17   Complaint was a nationwide practice of Defendants. Defendants conduct business

18   in the Commonwealth of Massachusetts. Upon information and belief, Defendants'

19   actions described herein occurred in Massachusetts as well.

20   733.   This is a qui tam action brought by Relator and State of Massachusetts for

21   treble damages and penalties under Massachusetts False Claims Act, Mass. Gen.

22   Laws Ann. Chap 12 § 5(A) *et seq.*

23   734.   Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person

24   who—

25   735.   Knowingly presents, or causes to be presented, a false or fraudulent claim

26   for payment or approval;

27   736.   Knowingly makes, uses, or causes to be made or used, a false record or

28                                  -135-

1   statement to obtain payment or approval of a claim by the commonwealth or any

2   political subdivision thereof;

3   737.   Conspires to defraud the commonwealth or any political subdivision thereof

4   through the allowance or payment of a fraudulent claim;

5   738.   Is a beneficiary of an inadvertent submission of a false claim to the common

6   wealth or political subdivision thereof, subsequently discovers the falsity of the

7   claim, and fails to disclose the false claim to the commonwealth or political

8   subdivision within a reason able time after discovery of the false claim.

9   739.   In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the

10  solicitation, receipt or offering of any remuneration, including any bribe ore rebate,

11  directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing

12  any good, service or item for which payment may be made in whole or in part

13  under the Massachusetts Medicaid program.

14  740.   Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least

15  2005 to the present by engaging in the fraudulent and illegal practices described

16  herein.

17  741.   Defendants furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and

18  knowingly caused hundreds of thousands of false claims to be made, used and

19  presented to the State of Massachusetts from at least 2005 to the present by its

20  violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E §

21  41, the Anti-Kickback Act and the Stark Act, as described herein.

22  742.   The State of Massachusetts, by and through the Massachusetts Medicaid

23  program and other state health care programs, and unaware of Defendants'

24  fraudulent and illegal practices, paid the claims submitted by health care providers

25  and third party payers in connection therewith.

26  743.   Compliance with applicable Medicare, Medicaid and the various other

27  federal and state laws cited herein was an implied, and upon information and

28
-136-

1   belief, also an express condition of payment of claims submitted to the State of

2   Massachusetts in connection with Defendants' fraudulent and illegal practices.

3   744.   Had the State of Massachusetts known that Defendants were violating the

4   federal and state laws cited herein, it would not have paid the claims submitted by

5   health care providers and third party payers in connection with Defendants'

6   fraudulent and illegal practices.

7   745.   As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 §

8   5B the State of Massachusetts has been damaged in an amount far in excess of

9   millions of dollars exclusive of interest.

10   746.   Relator are private persons with direct and independent knowledge of the

11   allegations of the Compliant, who have brought this action pursuant to Mass. Gen.

12   Laws Ann Chap. 12 § 5(c)(2) on behalf of themselves and the State of

13   Massachusetts.

14   747.   This Court is requested to accept supplemental jurisdiction of this related

15   state claim as it is predicated upon that exact same facts as the federal claim, and

16   merely asserts separate damage to the State of Massachusetts in the operation of its

17   Medicaid program.

18   748.   Pursuant to the Massachusetts False Claims Act, the State of Massachusetts

19   and Relator are entitled to the following damages as against Defendants:

20   749.   To the STATE OF MASSACHUSETTS:

21   750.   Three times the amount of actual damages which that State of Massachusetts

22   has sustained as a result of Defendants' fraudulent and illegal practices;

23   751.   A civil penalty of not less than $5,500 and not more than $11,000 for each

24   false claim which Defendants caused to be presented to the State of Massachusetts;

25   752.   Prejudgment interest; and

26   753.   All costs incurred in bringing this action.

27   754.   To RELATOR:

28

-137-

755.   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12
§ 5F and/or any other applicable provision of law;

756.   Reimbursement for reasonable expenses which Relator incurred in
connection with this action;

757.   An award of reasonable attorneys' fees and costs; and

758.   Such further relief as this court deems equitable and just.

## COUNT XXIV

**(Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq*.)**

759.    Relator re-allege and incorporate the allegations above as if fully set for
herein and further alleges as follows.

760.   Additionally, Relator state that the course of conduct described in this
Complaint was a nationwide practice of Defendants. Defendants conduct business
in Michigan. Upon information and belief, Defendants' actions described herein
occurred in Michigan as well.

761.   This is a qui tam action brought by Relator and State of Michigan for treble
damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A.
400.601 *et seq.*

762.   M.C.L.A. 400.607 provides liability for any person who, among other
things—

763.   Causes to be made or presented to an employee or officer of this state a
claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as
amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon
or against the state, knowing the claim to be false.

764.   Presents or causes to be made or presented a claim under the social welfare
act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely
represents that the goods or services for which the claim is made were medically
necessary in accordance with professionally accepted standards.

-138-

765.   In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

766.   Defendants violated M.C.L.A. 400.604 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

767.   Defendants furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2005 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

768.   The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

769.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' fraudulent and illegal practices.

770.   Had the State of Michigan known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

771.   As a result of Defendants' violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

772.   Relator are private persons with direct and independent knowledge of the

-139-

allegations of the Compliant, who have brought this action pursuant to M.C.L.A. 400.610a on behalf of themselves and the State of Michigan.

773.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

774.   Pursuant to the Michigan Medicaid False Claim Act, the State of Michigan and Relator are entitled to the following damages as against Defendants:

775.   To the STATE OF MICHIGAN:

776.   Three times the amount of actual damages which that State of Michigan has sustained as a result of Defendants' fraudulent and illegal practices;

777.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

778.    Prejudgment interest; and

779.   All costs incurred in bringing this action.

780.   To RELATOR:

781.   The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any other applicable provision of law;

782.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

783.   An award of reasonable attorneys' fees and costs; and

784.   Such further relief as this court deems equitable and just.

## COUNT XXV

### (Minnesota False Claims Act, (Minnesota Statutes § 15C.01 *et seq.*)

785.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

786.   Additionally, Relator state that the course of conduct described in this

-140-

1  Complaint was a nationwide practice of Defendants. Defendants conduct business
2  in Minnesota. Upon information and belief, Defendants' actions described herein
3  occurred in Minnesota as well.

4  787.   This is a qui tam action brought by Relator and the State of Minnesota to
5  recover treble damages and civil penalties under the Minnesota False Claims Act,
6  Minnesota Statutes § 15C.01 *et seq.*

7  788.   Minnesota Statutes § 15C.02 provides liability for any person who-

8  789.   Knowingly presents, or causes to be presented, to an officer or employee of
9  the state or a political subdivision a false or fraudulent claim for payment or
10  approval;

11  790.   Knowingly makes or uses, or causes to be made or used, a false record or
12  statement to get a false or fraudulent claim paid or approved by the state or a
13  political subdivision;

14  791.   Knowingly conspires to either present a false or fraudulent claim to the state
15  or a political subdivision for payment or approval or makes, uses, or causes to be
16  made or used a false record or statement to obtain payment or approval of a false
17  or fraudulent claim.

18  792.   Defendants violated Minnesota Statutes § 15C.02 from at least 2005 to the
19  present by engaging in the fraudulent and illegal practices described herein.

20  793.   Defendants furthermore violated Minnesota Statutes § 15C.02 and
21  knowingly caused thousands of false claims to be made, used and presented to the
22  State of Minnesota from at least 2005 to the present by its violation of federal and
23  state laws, including the Anti-Kickback Act, and the Stark Act, as described
24  herein.

25  794.   The State of Minnesota, by and through the State of Minnesota Medicaid
26  program and other state health care programs, and unaware of Defendants'
27  fraudulent and illegal practices, paid the claims submitted by health care providers

28

Complaint for Damages and Demand for
Jury Trial

1  and third payers in connection therewith.

2  795.   Compliance with applicable Medicare, Medicaid and the various other

3  federal and state laws cited herein was an implied, and upon information and

4  belief, also an express condition of payment of claims submitted to the State of

5  Minnesota in connection with Defendants' fraudulent and illegal practices.

6  796.   Had the State of Minnesota known that Defendants were violating the

7  federal and state laws cited herein, it would not have paid the claims submitted by

8  health care providers and third party payers in connection with Defendants'

9  fraudulent and illegal practices.

10  797.   As a result of Defendants' violations of Minnesota Statutes § 15C.02 the

11  State of Minnesota has been damaged in an amount far in excess of millions of

12  dollars exclusive of interest.

13  798.   Relator have direct and independent knowledge of the allegations of this

14  Complaint, who have brought this action pursuant to Minnesota Statutes § 15C.05

15  on behalf of themselves and the State of Minnesota.

16  799.   This Court is requested to accept supplemental jurisdiction of this related

17  state claim as it is predicated upon the exact same facts as the federal claim, and

18  merely asserts separate damage to the State of Minnesota in the operation of its

19  Medicaid program.

20  800.   Pursuant to the Minnesota False Claims Act, the State of Minnesota and

21  Relator are entitled to the following damages as against Defendants:

22  801.   To the STATE OF MINNESOTA:

23  802.   Three times the amount of actual damages which the State of Minnesota has

24  sustained as a result of Defendants' fraudulent and illegal practices;

25  803.   A civil penalty of not less than $5,500, and not more than $11,000 for each

26  false claim which Defendants caused to be presented to the State of Minnesota;

27  804.   Prejudgment interest; and

28

Complaint for Damages and Demand for
Jury Trial

805.   All costs incurred in bringing this action.

806.   To RELATOR:

807.   The maximum amount allowed pursuant to Minnesota Statutes § 15C.12 and § 15C.13 and /or any other applicable provision of law;

808.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

809.   An award of reasonable attorneys' fees and costs; and

810.   Such further relief as this court deems equitable and just.

## COUNT XXVI

### (Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 *et seq.*)

811.    Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

812.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Missouri. Upon information and belief, Defendants' actions described herein occurred in the State of Missouri as well.

813.   This is a qui tam action brought by Relator and the State of Missouri to recover treble damages and civil penalties under the Missouri Health Care Payment Fraud And Abuse Act, Missouri Revised Statutes § 191.900 et seq.

814.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) provides liability for any person –

815.   Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;

816.   Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment

Complaint for Damages and Demand for
Jury Trial

made by a health care payer for providing health care;

817.   Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled.

818.   Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health care of lesser value than that described in the claim was provided.

819.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(2) provides liability if any person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for -

820.   Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

821.   Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

822.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(3) provides liability if any person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

823.   Defendants violated the Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

824.   Defendants furthermore violated Missouri Health Care Payment Fraud And

-144-

Abuse Act § 191-905(1) & (2) & (3) and knowingly caused thousands of false claims to be made, used and presented to Missouri from at least 2005 to the present by its violation of federal and state laws, including Missouri Revised Statutes §191-905(3), the Anti-Kickback Act and Stark Act Requirements, as described herein.

825.   Missouri, by and through the Missouri Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

826.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Missouri in connection with Defendants' fraudulent and illegal practices.

827.   Had the State of Missouri known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

828.   As a result of Defendants' violations of § 191-905(1) & (2) & (3), the State of Missouri has been damaged in an amount far in excess of millions of dollars exclusive of interest.

829.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Missouri Revised Statutes § 191.907 on behalf of themselves and the State of Missouri.

830.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Missouri in the operation of its Medicaid program.

Complaint for Damages and Demand for
Jury Trial

831.   Pursuant to the Missouri Health Care Payment Fraud And Abuse Act, the State of Missouri and Relator is entitled to the following damages as against Defendants:

832.   To the STATE OF MISSOURI:

833.   Three times the amount of actual damages which the State of Missouri has sustained as a result of Defendants' fraudulent and illegal practices;

834.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Missouri;

835.   Prejudgment interest; and

836.   All costs incurred in bringing this action.

837.   To RELATOR:

838.   The maximum amount allowed pursuant to Missouri Revised Statutes § 191.907 and /or any other applicable provision of law;

839.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

840.   An award of reasonable attorneys' fees and costs; and

841.   Such further relief as this court deems equitable and just.

## COUNT XXVII

### (Montana False Claims Act, MT ST 17-8-401 *et seq.*)

842.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

843.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Montana. Upon information and belief, Defendants' actions described herein occurred in Montana as well.

844.   This is a qui tam action brought by Relator and State of Montana for treble damages and penalties under Montana False Claims Act, MT ST 17-8-401 *et seq.*

Complaint for Damages and Demand for
Jury Trial

845.   MT ST 17-8-403 provides liability for any person who—

846.   knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;

847.   knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;

848.   conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

849.   In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

850.   Defendants violated MT ST 45-6-313 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

851.   Defendants furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana from at least 2005 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

852.   The State of Montana, by and through the Montana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

853.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendants' fraudulent and illegal practices.

Complaint for Damages and Demand for
Jury Trial

854.   Had the State of Montana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

855.   As a result of Defendants' violations of MT ST 17-8-403 the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

856.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to MT ST 17-8-406 on behalf of themselves and the State of Montana.

857.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

858.   Pursuant to the Montana False Claims Act, the State of Montana and Relator are entitled to the following damages as against Defendants:

859.   To the STATE OF MONTANA:

860.   Three times the amount of actual damages which that State of Montana has sustained as a result of Defendants' fraudulent and illegal practices;

861.   A civil penalty of between $5,500 and $11,000 (adjusted for inflation) for each false claim which Defendants caused to be presented to the State of Montana;

862.   Prejudgment interest; and

863.   All costs incurred in bringing this action.

864.   To RELATOR:

865.   The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other applicable provision of law;

866.   Reimbursement for reasonable expenses which Relator incurred in

1  connection with this action;

2  867.   An award of reasonable attorneys' fees and costs; and

3  868.   Such further relief as this Court deems equitable and just.

4  ## COUNT XXVIII

5  ### (Nevada False Claims Act, N.R.S. § 357.010 *et seq.*)

6  869.    Relator re-allege and incorporate the allegations above as if fully set for

7  herein and further alleges as follows.

8  870.   Additionally, Relator state that the course of conduct described in this

9  Complaint was a nationwide practice of Defendants. Defendants conduct business

10  in the State of Nevada. Upon information and belief, Defendants' actions described

11  herein occurred in Nevada as well.

12  871.   This is a qui tam action brought by Relator and the State of Nevada to

13  recover treble damages and civil penalties under the Nevada False Claims Act,

14  N.R.S. § 357.010 et. seq.

15  872.   N.R.S. § 357.040(1) provides liability for any person who—

16  873.   Knowingly presents or causes to be presented a false claim for payment or

17  approval;

18  874.   Knowingly makes or uses, or causes to be made or used, a false record or

19  statement to obtain payment or approval of a false claim;

20  875.   Conspires to defraud by obtaining allowance or payment of a false claim;

21  876.   Is a beneficiary of an inadvertent submission of a false claim and, after

22  discovering the falsity of the claim, fails to disclose the falsity to the state or

23  political subdivision within a reasonable time.

24  877.   In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt

25  of anything of value in connection with the provision of medical goods or services

26  for which payment may be made in whole or in part under the Nevada Medicaid

27  program.

28

-149-

Complaint for Damages and Demand for
Jury Trial

878.   Defendants violated N.R.S. § 422.560 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

879.   Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2005 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described herein.

880.   The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

881.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' fraudulent and illegal practices.

882.   Had the State of Nevada known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

883.   As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

884.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

885.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

Complaint for Damages and Demand for
Jury Trial

merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

886.   Pursuant to the Nevada False Claims Act, the State of Nevada and Relator are entitled to the following damages as against Defendants:

887.   To the STATE OF NEVADA:

888.   Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' fraudulent and illegal practices;

889.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Nevada;

890.   Prejudgment interest; and

891.   All costs incurred in bringing this action.

892.   To RELATOR:

893.   The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other applicable provision of law;

894.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

895.   An award of reasonable attorneys' fees and costs; and

896.   Such further relief as this Court deems equitable and just.

**COUNT XXIX**

**(New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*)**

897.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

898.   Additionally, Defendants conduct business in the New Jersey. Upon information and belief, Defendants' actions described herein occurred in New Jersey as well.

899.   This is a qui tam action brought by Relator and State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A.

Complaint for Damages and Demand for
Jury Trial

1    2A:32C-1 *et seq.*

2    900.   N.J.S.A. 2A:32C-3 provides liability for any person who—

3    901.   Knowingly presents or causes to be presented to an employee, officer or

4    agent of the State, or to any contractor, grantee, or other recipient of State funds, a

5    false or fraudulent claim for payment or approval;

6    902.   Knowingly makes, uses, or causes to be made or used a false record or

7    statement to get a false or fraudulent claim paid or approved by the State;

8    903.   Conspires to defraud the State by getting a false or fraudulent claim allowed

9    or paid by the State.

10   904.   In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any

11   kickback, rebate or bribe in connection with the furnishing of items or services for

12   which payment is or may be made in whole or in part under the New Jersey

13   Medicaid program, or the furnishing of items or services whose cost is or may be

14   reported in whole or in part in order to obtain benefits or payments under New

15   Jersey Medicaid.

16   905.   Defendants violated N.J.S.A. 30:4D-17 from at least 2005 to the present by

17   engaging in the fraudulent and illegal practices described herein.

18   906.   Defendants furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused

19   hundreds of thousands of false claims to be made, used and presented to the State

20   of Nevada from at least 2005 to the present by its violation of federal and state

21   laws, including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as

22   described herein.

23   907.   The State of New Jersey, by and through the New Jersey Medicaid program

24   and other state health care programs, and unaware of Defendants' fraudulent and

25   illegal practices, paid the claims submitted by health care providers and third party

26   payers in connection therewith.

27   908.   Compliance with applicable Medicare, Medicaid and the various other

28

-152-

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' fraudulent and illegal practices.

909.   Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

910.   As a result of Defendants' violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

911.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of themselves and the State of New Jersey.

912.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

913.   Pursuant to the New Jersey False Claims Act, the State of New Jersey and Relator are entitled to the following damages as against Defendants:

914.   To the STATE OF NEW JERSEY:

915.   Three times the amount of actual damages which that State of New Jersey has sustained as a result of Defendants' fraudulent and illegal practices;

916.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

917.   Prejudgment interest; and

918.   All costs incurred in bringing this action.

919.   To RELATOR:

Complaint for Damages and Demand for
Jury Trial

920.   The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law;

921.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

922.   An award of reasonable attorneys' fees and costs; and

923.   Such further relief as this Court deems equitable and just.

### COUNT XXX

**(New Mexico Medicaid False Claims Act, and New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 27-14-1 *et seq*., and N. M. S. A. 1978, § 44-9-1 *et seq*.)**

924.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

925.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of New Mexico. Upon information and belief, Defendants' actions described herein occurred in the State of New Mexico as well.

926.   This is a qui tam action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 *et seq*. and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 *et seq*.

927.   N. M. S. A. 1978, § 27-14-4 provides liability for any person who-

928.   Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

929.   Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the

Complaint for Damages and Demand for
Jury Trial

state knowing such record or statement is false;

930.   Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

931.   N.M.S.A. 1978 § 44-9-3 provides liability for any person who-

932.   knowingly presents, or causes to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval;

933.   knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

934.   conspires to defraud the state by obtaining approval or payment on a false or fraudulent claim;

935.   conspires to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

936.   Defendants violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

937.   Defendants furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

938.   The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

-155-

939.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' fraudulent and illegal practices.

940.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

941.   As a result of Defendants' violations of N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

942.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N. M. S. A. 1978, § 27-14-7 and N. M. S. A. 1978, § 44-9-5 on behalf of themselves and the State of New Mexico.

943.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

944.   Pursuant to the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, the State of New Mexico and Relator are entitled to the following damages as against Defendants:

945.   To the STATE OF NEW MEXICO:

946.   Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' fraudulent and illegal practices;

947.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

-156-

1    948.   Prejudgment interest; and

2    949.   All costs incurred in bringing this action.

3    950.   To RELATOR:

4    951.   The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and

5    N. M. S. A. 1978, § 44-9-7 and /or any other applicable provision of law;

6    952.   Reimbursement for reasonable expenses which Relator incurred in

7    connection with this action;

8    953.   An award of reasonable attorneys' fees and costs; and

9    954.   Such further relief as this court deems equitable and just.

10                              **<u>COUNT XXXI</u>**

11        **(New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)**

12   955.    Relator re-allege and incorporate the allegations above as if fully set for

13   herein and further alleges as follows.

14   956.   Additionally, Relator state that the course of conduct described in this

15   Complaint was a nationwide practice of Defendants. Defendants conduct business

16   in the New York. Upon information and belief, Defendants' actions described

17   herein occurred in New York as well.

18   957.   This is a qui tam action brought by Relator and State of New York for treble

19   damages and penalties under New York False Claims Act, N.Y. State Finance Law

20   § 187 *et seq.*

21   958.   N.Y. State Finance Law § 189 provides liability for any person who—

22   959.   Knowingly presents, or causes to be presented, to any employee, officer or

23   agent of the state or a local government, a false or fraudulent claim for payment or

24   approval;

25   960.   Knowingly makes, uses, or causes to be made or used, a false record or

26   statement to get a false or fraudulent claim paid or approved by the state or a local

27   government;

28                                    -157-